## Case No. 15,647.
### UNITED STATES v. LYMAN.
[1 Mason, 482.] [1]
Circuit Court, D. Massachusetts. Oct. Term, 1818.
CUSTOMS DUTIES — HOW RECOVERABLE — DEBT — TAKING BOND—ENTRY OF GOODS.

1. Debt lies in favor of the United States against the importer for the duties due on goods imported. The right to duties accrues by the importation with an intent to unlade; and immediately upon the importation the duties become a personal charge and debt on the importer. A bond taken at the custom house to secure the duties due by the importer is not an

[1] [Reported by William P. Mason, Esq.]

extinguishment of the debt so accruing, but merely collateral security for its payment.

[Cited in U. S. v. Aborn, Case No. 14,418; Brown v. Maryland, 12 Wheat. (25 U. S.) 453. Distinguished in Knox v. Devens, Case No. 7.905. Cited in Harrison v. Vose, 9 How. (50 U. S.) 381; U. S. v. Ten Thousand Cigars, Case No. 16,450; U. S. v. Washington Mills, Id. 16.647; Waring v. Mobile, 8 Wall. (75 U. S.) 116; U. S. v. George, Case No. 15,198; Re Webster, Id. 17,332; Re Rosey, Id. 12,066; U. S. v. Cobb, 11 Fed. 79; U. S. v. Boyd, 24 Fed. 694; McAndrew v. Robertson, 29 Fed. 246.]

[Cited in Boody v. Watson, 64 N. H. 168, 188, 9 Atl. 794; Castor v. Davies, 8 Ark. 213; Jones v. Johnson, 3 Watts & S. 278.]

2. No person but the owner or consignee, or, in case of his sickness or absence, his agent or factor, is by the revenue laws entitled to enter and bond goods at the custom house. A sub-purchaser after importation has no such right. The collector has no authority to receive the bond of any person as security for the payment of duties, except such person be legally entitled to enter them.

[Distinguished in Knox v. Devens, Case No. 7.905. Cited in Johnson v. U. S., Id. 7,419; Toler v. White, Id. 14,079; Bottomley v. U. S., Id. 1,688; Greely v. Thompson, 10 How. (51 U. S.) 234; The Sarah B. Harris, Case No. 12,344; U. S. v. The Sarah B. Harris, Id. 16,223.]

3. Debt lies against the importer for the duties on smuggled goods. So, where by mistake or accident, or fraud, no bond is given to secure them. So, where short duties only have been paid.

[Approved in U. S. v. Hathaway, Case No. 15,326. Distinguished in Knox v. Devens, Id. 7,905. Cited in U. S. v. Cobb, 11 Fed. 79; U. S. v. Boyd, 24 Fed. 691; An Ullage Box of Sugar, Case No. 14,324; U. S. v. Segars, Id. 16,249. Cited in note to U. S. v. 12,347 Bags of Sugar, Id. 16,555.]

[Cited in brief in Ransdell v. Patterson, 1 App. D. C. 491.]

4. An information of debt, or an information in the nature of a bill of discovery and account, is a proper remedy for the United States in such cases.

[Cited in Walsh v. U. S., Case No. 17,116; Stockwell v. U. S., Id. 13,466; same case on appeal, 13 Wall. (80 U. S.) 543; Dollar Sav. Bank v. U. S., 19 Wall. (86 U. S.) 240, U. S. v. Elliot. Case No. 15,043.]

5. In what cases the taking of a higher security operates as an extinguishment of a debt, and in what cases not. Where such security is given by the debtor, primâ facie the law presumes it intended as an extinguishment of the debt. Aliter, where it is the bond of a third person.

[Approved in U. S. v. Astley, Case No. 14,-472. Cited in Knox v. Devens, Id. 7,905; Harris v. The Kensington, Id. 6,122.]

[Cited in Kelsey v. Western, 2 N. Y. 508. Cited in brief in Ward v. Motter, 2 Rob. (Va.) 539-542.]

6. It seems, that a debt accruing by a statute, though a specialty, is not of so high a dignity as a bond.

This was an action of debt, brought by the United States against the defendant [Theodore Lyman] for $17,242.40, being the amount of duties due on 500 chests of tea, imported into the port of Boston in the ship Alert, in July, 1816. Plea, nil debet. At the trial it appeared, that the defendant was the owner of the ship Alert, and of the 500 chests of tea in question; and that the same were imported by him into Boston, on the 2d day of July, 1816. After the arrival and entry of the ship at the custom house, the 500 chests of tea were, on the 8th day of July, purchased (whether really or nominally was a great question at the trial) by one Warren Lovejoy, who gave bonds at the custom house, in the usual form, upon a deposit of the teas; and afterwards, upon giving other bonds as usual, was permitted to receive the teas again, and they were re-delivered to and sold by the defendant. Soon after these transactions Lovejoy failed in business, and has ever since remained insolvent, and the bonds have never been paid.

Prescott & Thacher, for defendant contended, in the first place, that the action of debt at common law would not lie in this case; that there was a specific remedy for the government provided by statute, and that such remedy, therefore, must be pursued. Wherever a right is given by statute, and no remedy pointed out by which to enforce it, an action of debt at common law will lie; but wherever any remedy is provided by statute, such remedy is in exclusion of all others, and must be adopted. Stevens v. Evans, 2 Burrows, 1152; Smith v. Drew, 5 Mass. 514; Gedney v. Inhabitants of Tewksbury, 3 Mass. 307; Bigelow v. Cambridge & C. Turnpike Corp., 7 Mass. 202; Respublica v. Lacaze, 2 Dall. [2 U. S.] 118. It is contended with great confidence, that the legislature have expressly prescribed in the sixty-second section of the collection act of the 2d of March, 1799 [1 Stat. 673], what security shall be taken by the government for the duties on the article of tea; and that it is upon this security only, that they can have their remedy for the non-payment of such duties. In putting a construction on the different acts in relation to this subject, we should always bear it in mind, that it is not the object of the government to lay any unnecessary impositions upon the commercial part of the community, or uselessly to interrupt the facilities of foreign traffic. That, on the contrary, the essential interests of the country require, that commercial enterprise should receive every encouragement, for this is one of the principal sources of public revenue, and one of the most fruitful inlets to the national wealth; and to burden the merchant with excessive duties, or lay him under unreasonable obligations for their payment, would be striking at the foundation of the general welfare, no less than of individual prosperity. In conformity with such views, we shall find, that every act passed upon the subject of duties since their first establishment, has had it for a principal object to render the payment of them as light and convenient as possible.

The first statute laying a duty on goods, &c. imported into the United States, was

passed on the 4th day of July, 1789 [1 Stat. 24], and by this the importer became indebted to the government immediately upon the importation, and his acceptance of the goods; but as no provision was then made for the collection of the debts, the only remedy for the non-payment of the duties was an action of debt at common law against the delinquent importer. On the 31st of the same month another act was passed, regulating the collection of the duties before established; in the fifteenth section of which it is enacted, that an inspector shall be put on board every vessel, that arrives at any port of entry or delivery, who shall take charge of the goods, &c. in said ship, and not suffer any of them to be delivered without a permit from the proper officer. By this act, then, the government are put in possession of two distinct securities for their duties; one, the personal responsibility of the importer, the other, the actual possession of the goods themselves, on which the duties accrue. Neither of these securities, perhaps, taken by itself, would be sufficient, but when connected, they most perfectly protect the government from any loss, excepting such only as may arise from the indiscretion of their own officers. And we think it will be apparent, that as no better security than this was necessary, so it never has been the intention of the legislature, in their subsequent acts, to provide any in addition to it, but only to specify, what should be received in lieu thereof, when the interest of trade and the convenience of the merchant made it necessary, that this should be given up. We find, accordingly, that in the nineteenth section of the act last referred to, the importer is permitted to take his goods from the vessel, and from the possession of the collector upon complying with one of two conditions—either depositing with the collector so much of the merchandise as will be equal to twice the amount of duties, or else giving his bond with sureties to the satisfaction of the collector. It is very clear, that whichever of these alternatives the owner of the merchandise may think best to elect, the duties will be amply secured. If the former is made choice of, the government have very much the same security as before; a sufficient quantity of the merchandise, and the personal responsibility of the owner. If the latter, they have his bond with any names thereon the collector may demand.

The next act, of the 4th of August, 1790 [1 Stat. 145], makes express provision for the article of tea imported from China, allowing a credit of twelve months, instead of six, as in the case of other merchandise; provided the whole quantity of teas should be deposited, or bond given as before. It is observable, that no bond is here required of the person making entry of the teas, if the same are deposited; but by the statute of the 2d of March. 1799, which repeals the former one, and extends the credit given to

the term of two years, the single bond of the owner is required, together with the deposit of the teas, and, as we contend, in lieu of the simple responsibility he was before under to pay the duties, and not in addition to the same. In the sixty-second section of that statute it is enacted that, "on teas imported from China, it shall be at the option of the importer or importers (to be determined at the time of making entry hereof) either to secure the duties thereon, on the same terms and stipulations as on other goods, wares, and merchandise imported," (and these terms and stipulations were by depositing the goods, as before stated, and continuing the personal liability of the importer during their deposit, or by giving a bond with sureties to pay the duties in six months) "or to give his, her, or their bond to the collector of the district, where any such teas shall be landed, in double the amount of the duties thereupon, with condition for the payment of the said duties in two years from the date of such bond." This, then, is the security to be taken by the government in lieu of the personal liability of the importer, and the deposit of the goods, as in the case of other merchandise. The statute then goes on to say, "which bond shall be accepted by such collector without surety, upon the terms following; that is to say, the teas, for the duties whereof such bond shall be accepted, shall be deposited at the expense and risk of the said importer or importers, in one or more storehouses," &c. We contend then, that by the acceptance of the bond as described in this statute, the government released their common law remedy against the importer, and relied altogether upon this higher security, and their possession of the goods. The purpose of the statute was evidently to favor the merchant, and not to demand additional obligations of him. The duties upon tea, in the case of a considerable importation, amount to a large sum of money. It was the intention of the legislature to make the payment of them as convenient as possible. They, therefore, extend the credit to two years; and for this they only require, that, besides the possession of the goods, the owner or importer should come forward and acknowledge in a bond, that he is the person who is indebted to the government, and that he will pay the debt within the time limited. This they demand, instead of his single liability, because it does not lay any additional obligation on him, and at the same time affords to them a more safe and expeditious remedy than the action of debt at common law, by rendering certain the amount due, and the person indebted.

If the court does not agree with us, that the simple liability of the person making the entry is merged in the bond given by him, but continues until the duties are paid; we then contend that the purchaser of goods, while on ship board may lawfully enter and

secure the duties, and thereby discharge the importer; and that, if the jury shall find, that Lovejoy was such a purchaser in this case, then this action lies against him only. The words importer, owner, and consignee are used promiscuously in the acts passed on this subject. The act of 1789 says, that all duties, &c. shall be paid by the importer before a permit be granted for landing the goods, unless the amount of such duties shall exceed fifty dollars, "in which case it shall be at the option of the party making entry, to secure the same by bond." The act of 1790 provides, "That all teas imported from China, may, at the option of the proprietor or consignee thereof, be deposited," &c. The forty-ninth section of the last collection act, of 1799, speaks of the owner or consignee, and provides that the owner's name shall be inserted in the permit. The same act requires, that one appraiser shall be appointed by the owner, importer, or consignee. Besides the evidence to be drawn from the use of these different terms in the statutes, it seems but reasonable to suppose, that it was not the intention of the legislature to confine the making entry to the importer alone. Their only object was to provide the government with sufficient security; this was done by requiring a deposit of the teas in the first instance, and upon the relinquishment of them, a bond with as many sureties as the collector thought best to require. Under these circumstances, it would be of very little importance, who was the principal in the bonds. In addition to this, we find that such has been the construction put upon these statutes by the collectors ever since their passage; and that it has been the universal practice, up to this very moment, at the custom house, to take the bond of purchasers, and permit them to make entry. Upon the same grounds we contend, that Lovejoy might, if necessary, be considered as the consignee of these teas; they were consigned to order, and by purchasing before the entry, he made himself the consignee.

But if the court should be against us on all these points, we then contend that the bonds given by Lovejoy extinguished the defendant's liability; they would in that case be the bonds of a stranger. The duty upon the goods accrues immediately upon their importation; but the personal liability of the importer does not commence until he comes forward and accepts them. Before that time, the government have only a lien upon the goods for the duties; and if the duties are not paid within a certain time, the government are authorized by statute to dispose of the goods. In Hooper's Case, 2 Leon. 110, it was held, that a specialty of itself extinguished a simple contract, when given upon the contract, and at the time it was made. This doctrine has been frequently recognised, and never questioned. The defendant in this case never accepted these goods, never took any steps towards making entry of them before the bond was given by Lovejoy. If therefore Lovejoy should be considered as his agent in this business, then Lovejoy's bond was given upon the defendant's debt and at the time it accrued, and of consequence extinguished the same.

It has been thrown out by the counsel for the government, that the debt due in this case for the duties is a debt by specialty, and therefore not extinguished by a bond. We answer, that it has never been determined, that debts arising on statutes were specialties, excepting to avoid the statute of limitations; they never have been considered so in classing debts. In actions on statutes, the statute itself is not sufficient to maintain the action; the transgression or compliance with it must be proved by evidence dehors the statute. The debt for duties in this case, cannot properly be said to arise from statute; it arises from the importation and acceptance of the goods, and the plea of nil debet is a good plea. But, if the bond of a stranger could not of itself extinguish the debt, yet the acceptance of it in satisfaction would discharge the defendant. Tom v. Goodrich, 2 Johns. 213; Sluby v. Champlin, 4 Johns. 465; Geyer v. Smith, 1 Dall. [1 U. S.] 347; Schack v. Anthony, 1 Maule & S. 573; Drake v. Mitchell, 3 East. 251; Hooper's Case, 2 Leon. 110; Banorgee v. Hovey, 5 Mass. 11; Atty v. Parish, 4 Bos. & P. 104; 3 Bac. Abr. "Extinguishment," D. The acceptance of a bond, or even a note, or bill of exchange in satisfaction of a bond, discharges the debt. The collector represents the United States in every thing relating to collecting the duties. He had taken the single bond of Lovejoy, and still retained the teas in his custody. He then accepts, instead of the teas and the single bond of Lovejoy, his bond with sureties. The law makes the collector the judge of the security: the words are, "to give sureties to the satisfaction of the collector"; and it would be very hard upon the importer, if the government, after receiving through their officer as ample security as they saw fit to demand, should, in the event of its proving insufficient, lay the loss upon the importer. It is to be observed, that it is not required by the law, that the last bond with sureties should be the bond of the importer or person making the entry; it only requires, that he should give a bond with sureties, to the satisfaction of the collector. In this case the bond of Lovejoy was given, with such sureties as the collector thought sufficient; and the debt of the defendant, if there was any then subsisting against him, was thereby discharged.

Mr. Blake, U. S. Dist. Atty., and Mr. Webster, contended, on behalf of the United States, that by the importation, the importer incurred a personal debt, which the government could recover, either by action against the importer personally, or by proceeding against the goods. The statute enacts, that upon all goods imported, duties, at the established rates, shall

be levied, collected, and paid. This enactment creates a direct debt. The English statutes are not more positive. In England, also, there is a right to proceed against the goods themselves; yet it is holden, and was never doubted, that "debt lies for customs due for merchandise, though the goods are forfeited for non-payment." Com. Dig. "Debt" A, 9; 1 Rolle, 383. The king, says Lord Hale, may originally sue for the duty itself, as well as for the forfeiture for landing the goods, the duties not paid. Harg. Law Tracts, 216, 222. Ordinarily there is little motive to sue for the duties, so long as the goods themselves are retained, inasmuch as a more effectual and speedy remedy may be had by a direct proceeding against the goods. But where possession of the goods has been relinquished, through mistake, or otherwise; or where they have never been in the hands of the custom house, and other such cases, duties charged on them are recovered in the exchequer, either by English information, which is the king's bill in equity, or by information of debt, which is his action of debt. Instances of the former mode of proceeding are, among others, Attorney General v. Chitty, Parker, 37; Same v. Cresner, 1d. 279; Same v. Stranyforth, Bunb. 97; Same v. Senior, Doug. 411, in notis; Same v. Mico, Hardr. 137; Same v. ——, Id. 201; Waller v. Travers, Id. 301; Attorney General v. Horsham, Id. 477. Of the latter mode, the following are instances: Attorney General v. Jewers, Bunb. 225; Same v. Hatton, Id. 262; Same v. ——, Anstr. 558; Same v. Tooke, Hardr. 334; Same v. Weeks, Bunb. 223. If goods be smuggled, an action will still lie for duties; and after the expiration of the time for bringing a penal suit, and the right of proceeding for a forfeiture being waived, the importer may be called on, by information in equity, to disclose the amount and value of the goods thus smuggled. Parker, 279. So if goods upon which duties are charged perish, the owner is still liable for duties (Anstr. 558) because a charge of duties on the goods is a charge on the owner. It means, that he shall be debited with the amount. Some of the acts of congress say expressly, that the duties shall be paid by the importer. 2 U. S. Laws (New Ed.) p. 23. The action for duties is properly to be brought against the importer, and will not lie against his mere agent or servant; but a factor for a person abroad is treated as owner, and is liable for duties. He is considered as the importer. Bunb. 223.

It has been argued for the defendant, that wherever a statute gives a right, and prescribes the remedy, such prescribed remedy only can be pursued; and that the law having provided for bonds to be given for the duties, the government has no remedy but on the bonds. Various answers might be given to this argument. It would be sufficient to say, that the act laying the duties does not prescribe any mode of proceeding to collect them. The rule, therefore, does not apply to the case; for it is limited to cases, where the right and remedy are given and prescribed in the same statute. If a statute gives a right without prescribing a remedy, all proper legal remedies immediately attach to the right. And if afterwards another statute gives a particular remedy, but without words necessarily importing an exclusion of other remedies, the remedy thus given will be accumulative, and the former remedies will still remain. But another answer is, that no law of the United States prescribes a bond as a remedy, in the sense of the term as used in the cases cited. The United States cannot compel the importer to give bond. It is, therefore, not a remedy to enforce the collection of the duties, but a mere indulgence or option to the importer. A remedy, in the sense of the rule relied upon, means some course of legal proceeding by which the party may enforce his rights. It cannot, therefore, be any thing dependent on the will and pleasure of the party.

It is, in the next place, contended, that the importation is complete, and the obligation to pay the duties incurred, by bringing the goods into port, with intent to unload, and before entry. This point is very clearly settled by the cases. Harg. Law Tracts, 213, 216; Bunb. 97; The Mary [Case No. 9,183]; The Boston [Id. 1,670]; U. S. v. Arnold [Id. 14,469]; [U. S. v. Vowell] 5 Cranch [9 U. S.] 368. The legal meaning of importation and exportation is almost the exact, literal, and etymological signification of these terms. As importation is not the making entry of goods at the custom house, but merely the bringing them into port, and so is complete before entry; so exportation is not the clearance outward, but the actually going out of port. For if a vessel be cleared outwards, and has paid the export duties, and before she actually leaves the port, new export duties are laid, such duties attach on the cargo. 2 Price, 382. The vessel in this case entered the port, with intent to unload her cargo, on the 2d day of July. On that day, therefore, the duties became due. The defendant then became liable to pay them; and he must show, that this liability has in some way become extinguished. The duties not having been paid, nor released, has his original liability been extinguished? The duties having become a debt due to the United States immediately upon the importation of the goods, there were two modes, in either of which the United States might proceed to collect this debt. One was, a personal action against the importer. The other, a seizure of the goods themselves, if the duties were not paid or secured. These remedies were concurrent. Either might be pursued, or both. There being then two remedies, what is the object and effect of taking the bonds, supposing them to be given fairly and by the proper parties. The bond of the party, given for his own simple contract debt will, no doubt, extinguish such debt, because it is a higher se-

curity. But one bond will not extinguish another; nor are any causes shown, in which a bond will extinguish any debt created by specialty. Duties accruing on the importation of merchandise, are not simple contract debts; they arise ex vigore statuti, and therefore partake of the nature of specialties. But if this were otherwise, generally, by'the rules of law, yet, by the act of congress the bonds are but security, and are collateral to the original debt. The giving of long credits for duties, and the delivery of the merchandise in the mean time to the importer, were adopted originally for the benefit and promotion of trade, and to aid the capital of the country. Before the delivery of the goods, the government had two securities for the duties —the possession of the goods, and the personal ability of the importer. These were co-existing and concurrent. Then the act provides, that by giving bond, with approved sureties, to secure the payment of the duties, the importer may receive his goods. The bond, then, was intended as security, and to stand in the place of that security, which ·the government parted with. The bond with sureties is but a substitute for the possession of the goods; and as the two original remedies are concurrent, so the bond and the original remaining remedy are concurrent. The bond is taken, not as payment, but to secure the payment of the duties. The words of the act are, that the duties "shall be paid, or secured to be paid by bond" (Collection Act, 1799, § 62 [1 Stat. 673]); and in the case of teas, it is at the option of the importer, either "to secure" the "duties" in the same manner as on other goods, or to give his own bond, accompanied with a deposit of the teas. The bond being thus considered and treated by law as security for the debt, it is not payment of the debt but collateral to it, and does not extinguish the original personal liability.

If a mortgage be given to secure the payment of a promissory note, and the deed contain a covenant to pay it, this, although a covenant by deed, does not extinguish the note, because intended to be collateral. It may be observed further, that the bond is always given, not to pay a sum then ascertained, but to pay the duties when afterwards ascertained, which is another proof, that it was intended to be collateral to the original debt. It would be inconvenient, and often unjust. to restrain the United States to their remedy on the security. The bonds might be for too small a sum, either by fraud or mistake. They might be lost, or stolen, or given up to the obligors collusively, without actual payment. There may be remedies both in law and equity, by which the government is entitled to discover the value of goods imported, and to ascertain and recover the amount of duties, which would be wholly inapplicable to proceedings on the bond merely. For these reasons it is contended, that although the bond be given fairly, and by the proper parties, it does not extinguish the orig-

inal debt; but that the United States have their election to proceed on the bond, or to call on the importer, upon the ground of the original debt. This point, however, does not necessarily arise in this case because these bonds were not given by the proper parties. The original debt, in this case, was the debt of the defendant, as importer. The bond was given by Lovejoy and others. By the common law, the simple contract debt of one is not extinguished by the bond of another. It may be proven as matter of fact, that the bond of one man was received and accepted by the creditor in payment and satisfaction of the simple contract debt of another. And so may the promissory note of one be accepted in payment and satisfaction of the bond of another. But such cases are founded on the special agreement to accept, and not on the idea of an extinguishment by operation of law. If the collector in this case had voluntarily and without fraud or imposition accepted Lovejoy's bond for the defendant's debt (which we shall contend he clearly did not, when we come to the facts in proof) it would be a good defence for the defendant, provided the collector had any authority by law to accept such bond. But we deny, that he has any such authority. The defendant is acknowledged to have been the importer of the goods, and the law requires his bond to be taken. The collector is a ministerial officer, and the statute gives him in this particular no discretion. He is an agent, with a public power or authority; as well known to those who deal with him, as to himself; and therefore they are bound to see, that they deal with him only within the limit of his authority. The sections of the statute immediately applicable to this point, are the thirty-sixth and sixty-second. By the first it is provided, that the owner or owners, consignee or consignees, shall make entry of the goods. It is clear, that the owners here intended are the owners at the time of importation, because the form of entry prescribed by the same section is, "entry of merchandise imported by (insert the name of the importer or consignee.)" The entry, therefore, is to be made by the importer or consignee. It is further said, that the entry or sureties to be made by any importer, consignee, or agent. &c. shall be verified by the oath of the person making it. The form of the oath is there given; and the words and clauses of it are absurd in the mouth of anybody, but the importer or consignee  He is to swear among other things, that the original cost is correctly stated in the entry. How is this to be done by a purchaser after importation, who knows nothing, and can know nothing himself, of the original cost? He is to swear, that the invoices produced by him are true; whereas, not being the purchaser at the place of exportation, and the goods not having been sent to him, he cannot know, whether the invoices given to him are true or false. This is a matter of the utmost importance. The invoices, until the

act of the last session, have been the basis, upon which all ad valorem duties were calculated. They are to be verified by the oath of the importer, who knows whether they be true or false. But if other persons may enter goods and produce to the custom house such invoices merely as are produced to them, there is not even the security of a custom oath for the revenue.

By the sixty-second section, the duties are either to be paid immediately, or at the option of the importer to be secured to be paid by bond, with one or more sureties. Who is to be principal in the bond? Obviously, we should think, the importer. And in prescribing the form of the bond, in the blank left for the name of the obligors, the direction of the act is, "(here insert the name of the importer or consignee.)" In the case of teas the act declares, that the importer or importers, instead of giving bond with sureties in common form may have an option to give "his, her, or their bond" without sureties, accompanied with a deposit of the teas. In this case, then, the statute expressly required the importer's bond. There is in the same section a provision, that for the purpose of preventing frauds, arising from collusive transfers, all goods imported shall be taken to be, for the purposes of the act, the property of the person, to whom they may be consigned. In this case, the defendant was both owner and consignee. It has been suggested, that this provision was intended only to apply to cases, in which importers, being debtors to the government, and so not entitled to new credits, should assign the property to others, who might be able to obtain credit for the duties. But the provision is general; and if even that evil were the particular inducement to the legislature to make it, still, being general, it is properly applicable to other mischiefs of a similar sort.

On the whole, therefore, it is submitted, on the part of the United States, that the defendant, by the importation of the goods, became personally indebted for the duties. That this debt accrued immediately upon importation, and before entry. That if he had given his own bond with sureties, according to the act, it would not have extinguished the original debt without actual payment of the duties. That, at any rate, the defendant's original liability is not extinguished in this case, because his own bond was not given, and because the collector had no authority to take the bonds of other persons besides the importer.

The counsel then went into a discussion of the facts in evidence, to show even if the court should be against them on the law, that there never was any real sale of the teas by the defendant to Lovejoy. And secondly, that when the collector received this bond, he supposed Lovejoy to be the importer of the teas, and therefore never voluntarily accepted it, even if he had authority to do so, in discharge of a debt of the defendant.

STORY, Circuit Justice, after summing up the facts, charged the jury.

In this case the United States ground their claim to recover from the defendant upon no peculiar rights growing out of their prerogative, but upon principles, which every citizen might justly apply to vindicate his own rights under similar circumstances. There are several questions of law, which have been learnedly and ingeniously argued; and upon which, having formed a most decided opinion, it is my duty to pronounce it.

The first question is, whether an action of debt lies in this case. By the common law, an action of debt is the general remedy for the recovery of all sums certain, whether the legal liability arise from contract, or be created by a statute. And the remedy as well lies for the government itself, as for a citizen. And where the debt arises by statute, an action or information of debt is the appropriate remedy, unless a different remedy be prescribed by the statute. Bullard v. Bell [Case No. 2,121]. In respect to the duties payable upon the importation of goods, the usual proceeding, where no specialty has been taken as a security, is an information of debt, which is emphatically called the king's action of debt. But where a discovery, or account is wanted, either of the nature, or of the value of the goods imported, an exchequer information, in the nature of a bill in equity, for a discovery and account, is generally resorted to. Hale in Harg. Law Tracts, 216, 217; Attorney General v. Stranyforth, Bunb. 97; Attorney General v. Hatton, Id. 262; Attorney General v. Jewers, Id. 225; Waller v. Travers, Hardr. 301; Attorney General v. ——, 2 Anstr. 558. And informations of each kind are very common in cases, where goods have been smuggled, or where, by accident, mistake, or fraud, short duties only have been paid. Attorney General v. Jewers, Bunb. 225; Salter v. Malapert, 1 Rolle, 383; Attorney General v. Stranyforth, Bunb. 97; Attorney General v. Chitty, Parker, 37. The general principle upon which these informations rest, is, that in the given case the common law or the statute creates a debt, charge, or duty in the party personally to pay the duties immediately upon the importation; and that therefore, the ordinary remedies lie for this, as for any other acknowledged debt due to the crown. And it is a general rule in the construction of revenue statutes, that if a duty is charged on any article, the word "charged" means, that the owner shall be personally debited with that sum. Attorney General v. ——, 2 Anstr. 558. These doctrines fully apply to the case now before the court. The act of 27th of April, 1816, c 107 [3 Stat. 310], on which this action is founded, and which, in this respect, follows the language of the former acts upon the same subject, declares, that "there shall be levied, collected, and paid, the several duties therein after mentioned" on the goods therein enumerated,

when imported into the United States. And it has been repeatedly settled, both here and in England, that under such circumstances, the duties are a debt accruing to the government from the time of the actual importation. Salter v. Malapert, 1 Rolle, 383; Attorney General v. Stranyforth, Bunb. 97; Hale in Harg. Law Tracts, 212, 213; U. S. v. Vowell, 5 Cranch. [9 U. S.] 368; The Mary [Case No. 9,183]; U. S. v. Arnold [Id. 14,469]; s. c., 9 Cranch [13 U. S.] 104; Prince v. U. S. [Case No. 11,425]. And the importation is complete, as soon as the goods are brought within any port with the intention of being unladen or sold there.

From whom then does the debt accrue? Beyond all doubt from the importer, be he the owner, or the consignee of the goods; for by the express provisions of the revenue act of 1799, c. 128 [1 Story's Laws, 573; 1 Stat. 627, c. 22], the owner or consignee, or, in case of his absence or sickness, his factor or agent, are the only persons entitled to enter the goods, and the only persons, to whom the law allows (as will be hereafter shown) a credit for the duties to be given at the custom house. Immediately, therefore, upon the importation of these goods, the owner or importer owes a debt to the government, which, independent of any security by bond, it has a right to enforce by an action of debt upon the principles of the common law. To be sure, if a credit be allowable upon the duties, it is a debitum in præsenti solvendum in futuro. But I take it to be very clear, that no person can entitle himself to a credit under the revenue act of 1799, c. 128 [1 Story's Laws, 573; 1 Stat. 627, c. 22], unless he gives bonds in the manner prescribed by that law.

It being then ascertained, that upon the principles of the common law an action of debt is the proper remedy for duties against the owner or importer, the next consideration is, whether a different remedy has been prescribed by any statute of the United States. The argument of the defendant's counsel is, that by the revenue act of 1799, c. 128 [1 Story's Laws, 573; 1 Stat. 627, c. 22], the duties were required to be paid, or secured by bond to be paid, before they were permitted to be unladen; and that this security by bond constitutes the exclusive remedy for the government for the recovery of the duties. I cannot yield the slightest assent to this argument. In the first place, the bond, if given, is not strictly and accurately speaking a statute remedy, but a statute security for the debt. A remedy, as understood in legal phraseology, is a mode prescribed by law to enforce a duty or redress a wrong, and not an obligation to guaranty a right, or to indemnify against a wrong. The remedy for the duties, when a bond is given and remains unpaid, is not, technically speaking, the bond itself, but a suit to enforce the payment of the bond. The technical rule, therefore, that where a statute remedy is given, it excludes the com-

mon law remedy by action of debt, does not apply; for the statute prescribes no such remedy.

In the next place, the construction of the statute, assumed by the defendant's counsel, involves this difficulty, that, if true, the government have no remedy, where no bond is taken. Now, by the terms of the act no bond can be taken, where the duties do not exceed the sum of fifty dollars (section 62); and if, by any mistake, accident, or fraud, that sum is not paid, can it be contended, that the United States are without a remedy to recover it? Cases may easily be imagined of great inconvenience, if this doctrine were to prevail; and deeming a just and prompt collection of the revenue of the greatest importance, as well to the citizens as the government, I cannot believe, that any revenue act ought so to be interpreted, unless the interpretation be inevitable. Shall the importer, by his own illegal act, escape from the payment of a debt justly due to the government? Suppose by the purest accident, or mistake, no bond is taken for the duties, is the importer to be exonerated from all liability? Suppose a bond executed by an agent, and it turns out, that his authority had been revoked, or his principal was dead, is there no remedy against the principal or his representatives? Suppose, by mistake, the collector takes a bond for a sum less than the real duties, or for a less quantity of goods than is really imported, shall not the government recover for the short duties? It is clear, that if the collector were to take a bond for more than the legal duties, the importer would be entitled to redress; and why not, in the converse case, the government also? I put these cases, because they are precisely the cases, where the government would be compelled to resort to the general action of debt; and they show, in a strong light, how little reason there would be, to put an interpretation on the revenue act of 1799, which would lead to such mischievous results. If there be nothing in the reason of the thing to support this interpretation, there seems to be as little in the language of the statute to justify it. The revenue act of 1799, nowhere declares, that the duties shall not be due, unless bonds are taken for the payment. But, on the other hand, every section, touching the subject, speaks distinctly of the bonds, not as creating a right to the duties, but as a security for the payment of them. The distinction between a right, and the security of a right, is too obvious to require comment. Besides; it may be added, that the right to duties, grows, not out of the revenue act of 1799, c. 128 [1 Story's Laws, 573; 1 Stat. 627, c. 22]; but out of the duty act of 1816, c. 107. This latter act makes the duties a personal charge on the importer upon the principles, which have been already stated, independent of any other statute. Further; the importer is not com-

pellable in any case to give bonds for the duties; but it is at his option to give bonds, or to suffer the government to take the goods into its own possession, to secure the duties. Yet the right to duties certainly does not arise from the possession of the goods, nor is it confined to the goods. If they are destroyed or lost, or become of less value than the duties after the importation, the government have still a right to the full duties. And the very terms of the act of 1799, in cases of a deposit of the goods, prove them to be at the risk and expense of the parties, on whose account they are deposited. Act 1799, c. 128, §§ 52, 56, 62 [1 Story's Laws, 573; 1 Stat. 627, c. 22].

From all these considerations, I am without the slightest hesitation in pronouncing, that an action of debt well lies in favor of the government, to recover the duties levied under the revenue acts of the United States, independent of any bond which may be taken to secure them under the authority of those acts. Let us now apply the principles thus established to the present case. It is admitted, that the defendant was the owner of the teas at the time of their importation; and it follows, that he is indebted to the government in the sum stated in the declaration (which is the amount of the duties), and that the present action well lies against him for that debt, unless he can show a payment or extinguishment of it. No payment is pretended; but it is said, that there has been an extinguishment or satisfaction of the debt by the supposed purchase made by Lovejoy, and the acceptance of his bond for the duties at the custom house, in lieu of the deposit of the goods. It is to be recollected, that the supposed purchase by Lovejoy was made six days after the arrival and entry of the ship at the custom house. And the first question that meets us, is, whether any sub-purchaser, after the importation of the goods, has a right to enter the goods and secure the duties at the custom house? The language of the revenue act of 1799, c. 128 [1 Story's Laws, 573; 1 Stat. 627, c. 22], in every section bearing on this subject, most distinctly confirms the right to enter the goods to the owner or consignee, or, in case of his absence or sickness, to his agent or factor. And the very terms of the oath taken on this occasion, as well as the terms of the duty bond, expressly declare the party to be the importer in the character of owner or consignee. And the sixty-second section of the act further declares, that "to prevent all frauds arising from collusive transfers, all goods, wares, and merchandise, imported into the United States, shall, for the purposes of this act, be deemed and held to be the property of the persons to whom the said goods, &c. may be consigned, any sale, transfer, or assignment prior to the entry and payment, or securing the payment of the duties on the said goods, &c. and the

payment of all the bonds then due and unsatisfied by the said consignee, to the contrary notwithstanding." If in this case Lovejoy had become a purchaser or consignee, while the ship was in transitu, there might have been weight in the argument, that he had a right to enter the goods. But he was in no sense the importer of the goods, having become (if at all) a purchaser after the importation; and therefore, he had not, within the terms of the act, any authority to enter the goods. It is quite another question whether, having entered the goods as importer, he is not estopped to deny his own liability to pay the bonds into which he has entered.

But the court has been pressed with the usage, which has very extensively, and without question very innocently prevailed, to allow sub-purchasers, after importation, to bond the goods at the custom house, in lieu of the original importers. It is a sufficient answer to this statement, that no usage can prevail against the clear and unambiguous terms of the law. The collector is but a mere ministerial officer. It may be his misfortune, or the misfortune of the public, that he misinterprets the law; but certainly he cannot alter it. If it be inconvenient that sub-purchasers should not be permitted to bond goods at the custom house, it lies with the legislature, and not with collectors or courts of justice, to administer the proper relief. The collector then, in this case, had no authority to admit Lovejoy to enter the goods, or give bond for the duties. The whole proceeding was irregular, and not binding upon the United States. I do not say, that the bond was absolutely void; for it did not lie in the mouth of Lovejoy to contest it, after having admitted and sworn himself to be the importer liable to pay the duties. But the receipt of the bond by the collector was no estoppel to the United States, since no act of his, not within the scope of the law, could vary their rights.

In this view of the case, the bond of Lovejoy was no extinguishment of the original debt of the defendant for duties: (1) Because Lovejoy was not the importer entitled to give it; (2) because the collector is not authorized to receive the bond of a third person in extinguishment or satisfaction of any duties due by the importer; and (3) because the bond was in fact received by the collector, not in extinguishment of any debt supposed to be due from the defendant to the United States, but, under a mistake of the law, as security for the duties supposed to be due and payable by Lovejoy. But I am prepared to go yet farther, and to hold that a bond given under the revenue act of 1799, by the importer himself, and a fortiori by a third person (if legal) would not extinguish the original debt created by the act of importation. I admit the doctrine, that in general a higher security taken from the debtor himself extinguishes the original con-

tract. But this proceeds upon a presumption of law, that it is taken in satisfaction of the original debt; for if it appear otherwise upon the face of the security, it will not operate as an extinguishment. Thus, a bond of the debtor with sureties, or a mortgage, may be taken as collateral security for the payment of a promissory note; and in such case it certainly does not extinguish the demand on the note. It is, therefore after all, a mere question of intent; and the law, in the absence of all other evidence of the intent, construes the higher security of the debtor himself, as an extinguishment, because it gives a higher remedy. I admit, also, that a higher security of a third person, if taken at the time of making the original contract, or afterwards, in satisfaction of the debt, operates as an extinguishment. 3 Bac. Abr. "Extinguishment," D; Hooper's Case and Pudsey's Case, 2 Leon. 110; Banorgee v. Hovey, 5 Mass 11. But there is this difference between the case of a higher security of the debtor himself, and of a third person, that in the latter case the law does not presume the security to be taken in satisfaction, unless it is averred and proved to be the agreement of the parties so to consider it. Whether the receiving of a higher security from one partner for a partnership debt be an extinguishment, unless expressly taken in satisfaction of such debt, may perhaps admit of some doubt, notwithstanding the language of some highly respectable authorities. Tom v. Goodrich, 2 Johns. 213; Sluby v. Champlain, 4 Johns. 461; Clement v. Brush, 3 Johns. Cas. 180. Et vide Drake v. Mitchell, 3 East. 251. It is not, however, material to consider this point, for the present is clearly not the case of a partnership.

On the other hand, I admit, according to the authorities cited (Fawkeners v. Bellingham, Cro. Car. 81; Jones v. Pope, 1 Saund. 37; Hodsden v. Harridge, 2 Saund. 64; Pease v. Howard, 14 Johns. 479), that an action of debt founded on a statute is to be considered as an action founded on a specialty. But I cannot admit, that it follows, that it is a debt of equal dignity with a debt due by bond. There may be different grades, even in respect to debts due by specialty; and I cannot consider a debt due for duties, as of a higher dignity than a simple contract debt due to the crown, which is clearly subordinate to all debts due on specialties, technically so called. Toll. Ex'rs, bk. 3, c. 2, §§ 1–3. My opinion, therefore, that a bond taken under the revenue act of 1799, is not an extinguishment of the debt, accruing by the importation of the goods, is founded, not upon the notion, that the debts are of the same nature and dignity, but upon the intent and language of the statute itself. It provides, that within fifteen days after the arrival of the goods the importer may enter the goods, pay the duties at once, or give bond, with sufficient sureties, to secure the payment of the duties at a future period; or otherwise, the goods are to be deposited in the stores of the government, as a security for such payment. Act 1799, c. 128, §§ 36, 49, 62 [1 Story's Laws, 573; 1 Stat. 627, c. 22]. The government, therefore, has a lien upon the goods from the time of their importation for the amount of the duties; and it cannot, for a moment, be admitted, that the existence of this lien extinguishes the original debt. It is clearly collateral thereto; and the government may relinquish its lien on the goods without in any way affecting its right to the duties. The option given to the importer to substitute a bond with sureties in lieu of a deposit of his goods is with a view to relieve the goods from the lien for duties, and enable him to dispose of them freely in the market. The law, therefore, so far from intending to extinguish any existing debt, means no more than to substitute one species of security for another. And throughout the whole act, the bond is uniformly termed a bond to secure the duties, and not a bond in payment of the duties. If, therefore, the statute intended the bond as a mere security for the duties (and this intention is proved irresistibly to my mind) there is an end to the whole question; for in no case can a higher security operate an extinguishment against the plain import of the statute, under which it is taken.

It is not, however, necessary in this case to contend for so broad a doctrine, though I cannot discern any incorrectness in it. For, at all events, if Lovejoy were a real purchaser, his bond, given at the custom house, would be considered only as the security of a third person for the proper debt of the defendant, which would not per se extinguish the debt; and the collector had no authority to receive it expressly in satisfaction. And, on the other hand, if Lovejoy were a pretended purchaser only, then the defence cannot, in any possible view, be sustained consistently with the principles of law.

Verdict for the United States for the whole amount of duties.