## WARING *v.* THE MAYOR.

The Bay of Mobile being included within the statutory definition of the port of Mobile, contracts for the purchase of cargoes of foreign merchandise before or after the arrival of the vessel in the said bay, where the goods by the terms of the contract, are not to be at the risk of the purchaser until delivered to him in said bay, do not constitute the purchaser an " importer," and the goods so purchased and sold by him, though in the original packages, may be properly subjected to taxation by the State.

ERROR to the Supreme Court of Alabama; the question involved arising upon that clause of the Constitution which ordains that " no State shall lay any imposts on *imports*, or exports, except what may be absolutely necessary for executing its inspection laws."

The facts were these:

The city of Mobile is situated on the west bank of the Mobile River, a short distance above its entry into the Bay of Mobile. The bay stretches about thirty miles below the city, and is connected with the Gulf of Mexico by a narrow strait. The town of Mobile, by an act of Congress passed 22d July, 1813,* was designated as the only port of entry for a collection district bounded by West Florida on the east, and Louisiana on the west, and comprising the bays, inlets, and rivers emptying into the gulf. The Bay of Mobile is a part of this district. Vessels anchor twenty-five miles below the city, and are unladen there upon lighters, which bring their cargoes to the town. Those coming from Great Britain frequently bring a cargo of salt, and cargoes of this kind are generally sold in advance of their arrival, or as soon as they reach the bay, before bulk is broken, or they are unloaded.

In this state of commercial practice one Waring was in the habit of buying and selling salt thus imported. His custom was to purchase the entire cargo, which came in sacks, before the goods were entered at the custom-house, and usually before the arrival of the vessel, or while it was

---

* 3 Stat. at Large, 35.

in the lower bay. When it arrived in the lower bay, he furnished his own lighters, and took the cargo from off the vessel. Until the time of such delivery the risk remained in the shippers. The consignees made-the entries, presented the invoices and bills of lading, made the necessary deposit of coin for the estimated amount of the duties, and procured the permits; and when the duties were finally liquidated as required by law and the regulations of the Treasury Department, they adjusted and paid the balance.

When Waring sold the salt he sold it in the original packages, to traders, in large quantities and for re-sale.

In the year 1866, the corporate authorities of Mobile imposed a tax for municipal purposes upon all sales of merchandise in that city, and claimed of Waring a tax upon the sales of salt that he had made for six months preceding the date of the ordinance, under its conditions. He refused to pay, assigning for a reason that the salt disposed of by him was an import from a foreign country, and that the sales being made by him in the way they were, in the original packages, were still an "import;" and thus under the clause of the Constitution above quoted, he was not liable. The mayor arrested and fined him. The chancellor on a bill filed declared the tax illegal. The Supreme Court of the State on appeal held otherwise. They did not regard Waring as an importer, and considered that the constitutional prohibition upon the States to levy duties or taxes on imports had no application to him.

Waring accordingly brought the cause here for review.

*Mr. J. A. Campbell, for Waring, the plaintiff in error (a brief of Mr. P. Hamilton being filed):*

This court has decided, in *Brown v. State of Maryland,*[*] that under no form or pretence can any State levy any tax upon an article imported into or exported from that State; that all such proceedings by the State are absolutely null; that till articles imported from abroad have lost their character of "an import," and have become incorporated with

---

[*] 12 Wheaton, 419; and see Almy *v.* California, 24 Howard, 169.

the great mass of property, within the State, they are not subject to the jurisdiction of State authority. We rest upon the doctrine of these cases, and contend that, on the facts of this case, the right of interference by the State of Alabama had not arisen, as to this property or its proceeds.

The learned counsel then proceeded to argue—

That as the cargoes were purchased before their arrival or while the vessel was in the lower bay, and as the same were brought by Waring to the city, where they were weighed and the duties settled and paid, that he was to be regarded as an importer, and that his sales of the salt, in the original packages, were exempt from State taxation, under that clause of the Constitution which ordains, that no State shall "lay any imposts or duties on imports."

That this prohibition is universal, and applies to the thing imported, and has no reference to the person who may be the importer.

That this is a prohibition which Congress cannot waive or impair, except on condition that the tax be paid into the common treasury of the Union.

That the tax in this case was designed for municipal purposes, and had no reference to any inspection laws, and has no sanction from the consent of Congress.

That the port of entry was the city of Mobile, and that the salt was landed as the property of Waring.*

*Mr. P. Phillips*, *contra*, maintained—

That the city of Mobile is not the port of entry, but that the port is defined in the act of 22d July, 1813, and includes the whole bay, with the rivers, creeks, and inlets emptying into the Gulf of Mexico.

That whether the cargoes were contracted for before or after the arrival of the vessel in the bay was unimportant, as in either case, they remained wholly at the risk of the shipper or his consignee, until they were safely delivered to the lighters of Waring in the Bay of Mobile.

---

* United States *v.* Vowell, 5 Cranch, 368; Meredith *v.* United States, 13 Peters, 486; Arnold *v.* United States, 9 Cranch, 104; Conard *v.* Insurance Company, 1 Peters, 386; 6 Id. 263.

That until this delivery, neither the condition nor the weight or number of the sacks could be ascertained, and until this was done, it remained uncertain what was to be paid.

That the rule is the same in the civil as in the common law, "*Res perit domino*." Here the risk of Waring did not attach, *until the importation had become complete* by the arrival of the vessel at her destined port. He could in no sense be regarded as the owner until his risk commenced.*

The case of *Brown* v. *Maryland*, so much relied on by opposite counsel, maintains the right of the *importer* to sell free from all State intervention, but it also decides that when the importer has sold, the subject of the sale is taxable in the hands of the purchaser, and it is of no sort of consequence whether it retains the original form in which it was imported or not. Merchandise, in the original package, once sold by the importer, is taxable as other property.†

If the act of importation was complete, which it here was, before Waring became the owner of the goods, there was necessarily an importer. The exemption from State taxation applied to *him*. It cannot be applied to his vendee, without a double exemption; such an exemption would be absurd.

Mr. Justice CLIFFORD delivered the opinion of the court.

Merchants and traders, engaged in selling merchandise in the city of Mobile in the State of Alabama, are required by an ordinance passed by the corporate authorities to pay a tax to the city equal to one-half of one per cent. on the gross amount of their sales, whether the merchandise was sold at private sale or at public auction; and if they were so engaged the six months next preceding the 1st day of April, 1866, they were also required, within fifteen days thereafter, to return, under oath, to the collector of taxes, the gross amount of their sales during that period of time; and the

---

* 1 Troplong. Com. de la Vente, 86–88; Magee v. Billingsley, 3 Alabama, 689; Tarling v. Baxter, 6 Barnewall & Cresswell, 360; Simmons v. Swift, 5 Id. 857.

† Pervear v. Commonwealth, 5 Wallace, 479.

provision was, that if any such merchant or trader neglected or failed to make such return, he should be subject to such a fine, not exceeding fifty dollars per day, as the mayor of the city might impose for each day's failure or refusal.

Sales of merchandise were made by the complainant within that period to a large amount, and he was duly notified that he was required to make return, under oath, of the gross amount of such sales, and having neglected and refused to comply with that requirement within the time specified in the ordinance, the mayor of the city caused a summons to be issued and duly served, commanding the complainant to appear before him, as such mayor, to answer for such neglect, but he refused to obey the commands of the summons, and thereupon a warrant was issued, and he was arrested and brought before the mayor to answer for such contempt; and, after hearing, he was sentenced to pay a fine of fifty dollars for a breach of the before-mentioned ordinance. Subsequently, a second notice of a similar character was given, and the complainant still neglecting and refusing to make the required returns, he was again summoned to appear before the mayor to answer for the neglect, but he refused a second time to obey the commands of the precept, and, thereupon, such proceedings were had that he was again found guilty of contempt and was sentenced to pay an additional fine of fifty dollars.

Regarding these proceedings as unwarranted, the complainant filed a bill in equity against the mayor and tax-collector of the city, in the local Chancery Court, in which he prayed that the respondents might be enjoined from collecting the fines adjudged against him, and from any attempt to collect the tax, and that the tax might be adjudged to be null and void. Proofs were taken and the parties were heard, and the final decree of the Chancellor was, that the complainant was entitled to the relief asked, and that the injunction should be made perpetual; but that decree, on the appeal of the respondents to the Supreme Court of the State, was, in all things, reversed, and the Supreme Court entered a decree that the bill of complaint should be dismissed. Whereupon

the complainant in the Chancery Court sued out a writ of error, under the 25th section of the Judiciary Act, and removed the cause into this court.

Exemption from State taxation in this case is claimed by complainant upon the ground that the sales made by him were of merchandise, in the original packages, as imported from a foreign country, and which was purchased by him, in entire cargoes, of the consignees of the importing vessels before their arrival, or while the vessels were in the lower harbor of the port.

By the terms of the act of the 22d of July, 1813, it is provided, "that from and after the 1st day of August next, the town of Mobile shall be and the same is hereby established *the sole* port of entry for the district, including the shores, waters, and inlets of the bay and river Mobile, and of the other rivers, creeks, inlets, and bays emptying into the Gulf of Mexico, east of the said river Mobile, and west thereof, to the eastern boundary of the State of Louisiana."*

Mobile is the sole port of entry of the district, and next to New Orleans, is the largest cotton market in the United States, but vessels of large draft cannot cross the inner bar, and, consequently, are compelled to anchor in the lower harbor, some twenty or twenty-five miles below the city. Small vessels, such as can cross the inner bar, go up to the wharves to discharge and receive cargo, but large vessels, such as are usually employed to transport cotton, find their only anchorage in the lower harbor, where they are unloaded on their arrival, and where they receive their cargoes for the return voyage. Loading and unloading are accomplished by means of lighters, which sometimes are furnished by the ship and sometimes by the shipper, for the purpose of loading, and sometimes by the importer, and sometimes by the vendee of the merchandise, for the purpose of unloading, and for transporting the same to the private stores of the purchasers or the public warehouses.†

Ships frequently go there in ballast for cargoes of cotton,

---

* 3 Stat. at Large, 35.

† The Bark Edwin, 1 Clifford, 325; Same Case, 24 Howard, 389.

and those going there for that purpose from Liverpool frequently carry salt, using it in many cases as ballast instead of the articles more usually-employed, which do not pay freight. Such shipments are made by the owners or charterers of the vessel, and the salt, whether stowed as cargo or used as ballast, is usually consigned to the agents of the vessel. Purchases of salt imported under such circumstances were made by the complainant to a very large amount, and the record shows that he sold the salt at his place of business in the city to traders and large consumers in the original packages. The contracts to purchase were made before the goods were entered at the custom-house, with the consignees of the salt, sometimes before and sometimes after the arrival of the vessel at the anchorage in the lower harbor, but the terms of the contract in all cases were that the risk should continue to be in the shipper until the salt was delivered to the complainant over the side of the vessel into his lighters. He agreed to furnish the lighters and to bring them alongside of the vessel, and the contract was that the salt, when it was transshipped into the lighters of the complainant, became his property, and he assumed the risk and expense of transporting the same to the wharf and from thence to his own warehouse or place of business; but if the goods were lost before such delivery the agreement to purchase was not obligatory.

Viewed in the light of these conceded facts the defendants contend that the complainant was not the importer of the salt; that the salt was imported by the owners of the vessel, and that the sale of the salt as made by the consignees to the complainant was a sale of imported merchandise.

Goods imported from a foreign country are required to be entered at the custom-house of the port where the vessel voluntarily arrives with intent to unlade the cargo, and the settled law is that no one but the owner or consignee, or in case of his sickness or absence, his agent or factor, is authorized to discharge that obligation.*

* The Mary, 1 Gallison, 206; The Boston, Ib. 239; United States *v* Lyman, 1 Mason, 482; 1 Stat at Large, 655; Conrad *v.* Pacific Insurance Co., 6 Peters, 262; Gray *v.* Lawrence, 3 Blatchford, 117.

Importers of foreign merchandise must conform to the requirements of law and the regulations of the Treasury Department. American ships are forbidden to bring goods from any foreign port into the United States unless the master thereof shall have on board a manifest in writing, signed by the proper person, describing the goods and the vessel, and containing the name of the port where the goods were taken on board, and the name of the port for which the same are consigned or destined.*

Masters commanding any such ships, laden with such goods, on their arrival within four leagues of our coast, or within any of the bays, harbors, ports, or inlets thereof, are required, upon demand, to produce such manifest to such officer of the customs as shall come on board their ship, for his inspection, and it is made the duty of the said officer of the customs to certify the fact of compliance with that requirement and the day when it was so produced. Next requirement is that the master shall, within twenty-four hours after the arrival of any such ship at any port established by law, or within any harbor, inlet, or creek thereof, repair to the office of the chief officer of the customs and make a report of the arrival of the vessel. He may, if he sees fit, present his manifest at the same time, but if he omits so to do, the requirement is that he shall, within forty-eight hours, make a further report in writing to the collector of the district, which report shall be in form and shall contain all the particulars contained in the manifest.†

Imported goods may be entered for consumption or for warehousing, but it will not be necessary to refer to the course of proceeding when the goods are deposited in warehouse, as all the importations in this case were entered for consumption. Such entry must be in writing and must be made to the collector of the district within fifteen days after the required report is filed by the master. The form of the entry is prescribed by law and by the regulations of the Treasury Department, and the provision is that the owner

---

* 1 Stat. at Large, 644.        † 1 Ib. 649.

or consignee making the entry shall also produce to the collector and naval officer, if any, the original invoice or invoices of the goods, or other documents received in lieu thereof or concerning the same, in the same state in which they were received, with the bills of lading for the importation.*

Goods imported in any ship or vessel from any foreign port or place are required to be landed in open day, and the express provision of law is that none such shall be landed or delivered from such ship or vessel "without a permit from the collector and naval officer, if any, for such unlading and delivery."† Congress therefore has prescribed the rule of decision, and while that provision remains in force, no goods brought in any ship or vessel from any foreign port or place, unless falling within some exceptional rule, can lawfully be unladen or delivered from any such ship or vessel within the United States without a permit from the collector for such unlading or delivery; and the 62d section of the same act provides "that all duties on goods, wares, and merchandise imported shall be paid *or secured to be paid* before a permit shall be granted for landing the same;" which shows to a demonstration that all the salt in this case was imported before the property in the same became vested in the complainant.‡

Authority to grant a permit does not exist until the duties are paid or secured to be paid, and the duties are never paid or secured to be paid before the goods are imported, nor before they are entered for consumption. Before the permit is received by the inspector on board the ship or vessel, no one has authority to remove the hatches or to break bulk, but the cargo is under the charge of the officer of the customs. Following the notice of the arrival of the vessel and the exhibition of the manifest, the next step is to make the entry, which should always be accompanied by the invoice and bill of lading. Examination of the entry is usually made by the entry clerk, and if found to be correct, the collector proceeds to estimate the duties " on the invoice, value, and quantity," and if the estimated amount of duty is paid *or se-*

---

* 1 Stat. at Large, 656.   Gen. Reg. (1857), 145.
† Ib. 665.                         ‡ Ib. 673.

*cured to be paid* as required by law; the collector certifies the invoice and grants a permit in due form for the delivery of the cargo, first designating the packages, one in ten, to be sent to the public store for examination, and marking the same on the entry, invoice, and permit.*

Reference need not be made to the subsequent proceedings of the appraisers, weighers, and gaugers, preparatory to the liquidation of the duties, as no one pretends that any of those acts can be performed before the goods are imported.

In order to obtain a permit to discharge the salt into the lighters in this case, the proof is full to the point, that a deposit of coin had to be made at the custom-house by the consignees, and that the duties were finally paid by them as liquidated, after the true weight of the salt was ascertained by the return of the weighers. They made the entries, presented the invoices and bills of lading, made the necessary deposit of coin for the estimated amount of the duties, and procured the permits; and when the duties were finally liquidated as required by law and the regulations of the Treasury Department, they adjusted and paid the balance.

Whether the contracts to purchase were made before or after the vessel arrived in the bay is quite immaterial, as the agreement was, that the risk should continue to be in the owner or consignees until they delivered the salt into the complainant's lighters, alongside of the vessel. Delivery, under the terms of the contract, could not be made before the vessel arrived, nor before the salt was legally entered at the custom-house, as the hatches could not be removed for any such purpose until the permit was received from the collector.

Undoubtedly goods at sea may be sold by the consignees to arrive, and if they indorse and deliver the bill of lading to the purchaser, and he accepts the same under the contract as the proper substitute for the actual delivery and acceptance of the goods, the effect of the transaction is to vest a perfect title in the purchaser, discharged of all right of stop-

---

* Gen. Reg. (1857), 145.

page *in transitu* on the part of the vendor and indorser of the bill of lading.*

Nothing of the kind, however, was done in this case. On the contrary, the agreement was, that the loss, if before the delivery of the goods into the lighters, should fall on the shippers. Influenced by these considerations the court is of the opinion that the shippers or consignees were the importers of the salt, and that the complainant was the purchaser of the importers, and the second vendor of the imported merchandise.

Opposed to that view is the suggestion that goods are not regarded as having been imported into the United States until the vessel transporting the same from the foreign market has arrived at some one of our maritime ports with the intent to unlade the cargo. Where the voyage *is not ended*, and *there is no obstruction to prevent its being continued*, the rule in that behalf is as contended by the complainant. Decided cases to that effect are quite numerous and decisive, as applied in controversies involving the inquiry, whether the goods imported in a given case are affected by a new law or the repeal of an old one, whereby import duties are increased or diminished.†

Well-founded exceptions, however, exist to that general rule, and among the number is one created by the 85th section of the principal collection act.‡

By that section it is provided that where a ship or vessel shall be prevented by ice from getting to the port or place at which her cargo is intended to be delivered, the collector of the district may receive the report and entry of such ship or vessel, . . . and grant a permit for unlading or landing the goods imported, at any place within his district,

---

* Audenried v. Randall, 16 American Law Register, 664; Newsom v. Thornton, 6 East, 41; Pratt v. Parkman, 24 Pickering, 42.

† United States v. Vowell, 5 Cranch, 372; Schooner Mary, 1 Gallison, 209; The Boston, Ib. 245; United States v. Arnold, 1 Ib. 353; Same v. Lindsey, 1 Ib. 365; Harrison v. Vose, 9 Howard, 381; United States v. Lyman, 1 Mason, 482; Meredith v. United States, 13 Peters, 494.

‡ 1 Stat. at La ge, 694.

which shall appear to him most convenient and proper. Variations from the usual course of proceedings in such matters are also necessarily made at all the ports and places where lighters are required in loading and unloading ships and vessels engaged in commerce and navigation.

More than half a century has elapsed since the act of Congress was passed establishing the town of Mobile the sole port of entry for that district, and the record furnishes abundant reason to conclude that the course of proceedings throughout that entire period, in respect to imported goods brought there from foreign countries in ships and vessels whose draft was such that they could not cross the inner bar, has been the same as that heretofore described. Permanent as the obstruction to navigation is, the case is much stronger even than the one for which provision is made in the principal collection act, and after such long acquiescence by all interested in the course pursued by the officers of the customs, the court is of the opinion that the proceedings may well be sustained.

Congress has the power to regulate commerce with foreign nations, and among the several States, and with the Indian tribes, and the Constitution also provides that no State shall, without the consent of the Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws, with a view to raise a revenue for State purposes. The State of Maryland passed a law requiring all importers of foreign articles, enumerated in the law, and other persons selling the same by wholesale, before they should be authorized to sell the imported articles, to take a license, for which they were required to pay fifty dollars, and in case of refusal or neglect, the provision was, that they should forfeit the amount of the license tax and be subject to a fine of one hundred dollars.* Subsequently an importing merchant, resident in the State, refused to pay the tax, and the State court sustained the validity of the State law, and imposed on him the penalty

---

* Brown v. Maryland, 12 Wheaton, 437.

therein prescribed. Dissatisfied with the judgment he removed the cause into this court by writ of error, and this court held, Marshall, C. J., giving the opinion of the court, that the State law was a tax on imports, and that the mode of levying it, as by a tax on the occupation of the importer, merely varied the form in which the tax was imposed without varying the substance; that while the articles imported remained the property of the importer in his warehouse in the original forms or packages in which they were imported, a tax upon them was too plainly a duty on imports to escape the prohibition of the Constitution, but the court admitted that whenever the importer has so acted upon the thing imported that it has become incorporated and mixed with the mass of property in the country, it must be considered as having lost its distinctive character as an import, and as having become subject to the taxing power of the State.

Sales by the importer are held to be exempt from State taxation because the importer purchases, by the payment of the duty, a right to dispose of the merchandise as well as to bring it into the country, and because the tax, if it were held to be valid, would intercept the import, as an import, in the way to become incorporated with the general mass of property, and would deny it the privilege of becoming so incorporated until it should have contributed to the revenue of the State.*

But the sales of the goods imported in this case were made by the shippers or consignees, and the complainant was the purchaser, and not the first vendor of the imported merchandise, and it is settled law in this court that merchandise in the original packages once sold by the importer is taxable as other property.†

When the importer sells the imported articles, or otherwise mixes them with the general property of the State by breaking up the packages, the state of things changes, as was said by this court in the leading case, as the tax then

---

* Brown v. Maryland, 12 Wheaton, 443; Almy v. California, 24 Howard. 173

† Pervear v. Commonwealth, 5 Wallace, 479.

finds the articles already incorporated with the mass of property by the act of the importer.

Importers selling the imported articles in the original packages are shielded from any such State tax, but the privilege of exemption is not extended to the purchaser, as the merchandise, by the sale and delivery, loses its distinctive character as an import.

Decree affirmed.