## COOK *v.* PENNSYLVANIA.

1. A tax laid by a State on the amount of sales of goods made by an auctioneer is a tax on the goods so sold.
2. The statute of Pennsylvania of May 20, 1853, modified by that of April 9 1859, requiring every auctioneer to collect and pay into the State treasury a tax on his sales, is, when applied to imported goods in the original packages, by him sold for the importer, in conflict with sects. 8 and 10 of art. 1 of the Constitution of the United States, and therefore void, as laying a duty on imports and being a regulation of commerce.

ERROR to the Supreme Court of the State of Pennsylvania.

This action, which was brought in the Court of Common Pleas of Dauphin County, Pennsylvania, was tried by the court upon the following case, stated in the nature of a special verdict.

The Commonwealth of Pennsylvania claims from the defendant, Samuel C. Cook, who, by the governor, was duly appointed and commissioned an auctioneer in and for the city of Philadelphia, the sum of $757.83, for taxes due at one-half of one per cent and three-fourths of one per cent, as per his report furnished to the auditor-general, and settlement made by the auditor-general and State treasurer, dated Jan. 3, 1871, upon sales made by him of foreign goods placed in his hands by the importer, in bulk or original packages, to be sold at auction as an auctioneer in the original packages as imported, and which were so sold by him at auction as an auctioneer. The Commonwealth claims the said taxes under the act of assembly entitled " An Act to incorporate the Commercial Mutual Insurance Company of Philadelphia, relative to the State duty on domestic and foreign articles in the counties of Philadelphia and Allegheny," &c., approved the twentieth day of May, 1853, P. L. 1853, 679; and under the act of assembly entitled " An Act to modify the existing laws of the Commonwealth, and to provide more effectually for the collection of the State tax or duty on auction sales in the city of Philadelphia and county of Allegheny," approved April 9, 1859, P. L. 1859, 435.

The defendant claims that said sales of foreign goods are exempt from taxation, because said acts of assembly, so far as they relate to such taxation, are in direct conflict with sects.

8 and 10 of art. 1 of the Constitution of the United States, and for that and other reasons void; and inasmuch as the foreign goods so taxed as aforesaid were sold in bulk, as they were imported by the importer, said defendant, Cook, acted simply as his salesman.

That as the said goods had never been sold for consumption or resale by the importer, and had never been divided by him into smaller quantities by breaking up the casks or packages in which they were originally imported, the said goods had not lost their character as imports, and therefore that any such tax is unconstitutional and ought not to be levied.

That if the court should be of the opinion that the acts of assembly are constitutional, then judgment should be entered for the Commonwealth, but if not, then for the defendant, Cook; costs to follow the judgment, and either party reserving the right to sue out a writ of error.

The court being of the opinion that the defendant was properly charged with the tax, and that the laws under which it was assessed were constitutional, gave judgment in favor of the Commonwealth. That judgment having been affirmed by the Supreme Court of Pennsylvania, Cook sued out this writ of error.

The statutes of Pennsylvania referred to in the case stated are set out in the opinion of the court.

*Mr. Benjamin Harris Brewster* for the plaintiff in error.

As the goods sold by Cook had not lost their character as imports, the tax imposed was upon them, and is therefore in direct repugnance to the provisions of the Constitution of the United States, which declare that " no State shall, without the consent of Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws;" and that Congress shall have power " to regulate commerce with foreign nations, and among the several States, and with the Indian tribes." *Brown* v. *State of Maryland*, 12 Wheat. 419; *The License Cases*, 5 How. 504; *Pervear* v. *The Commonwealth*, 5 Wall. 475; *Samie* v. *Austin*, 13 id. 29; *Case of the State Freight Tax*, 15 id. 232; *Waring* v. *The Mayor*, 8 id. 110; *People* v. *Waring*, 3 Keyes (N. Y.), 374; *Pennsylvania Railroad* v. *Commonwealth*, 3 Grant (Pa.), 130;

*Welton* v. *The State of Missouri*, 91 U. S. 275; *Henderson* v. *The Mayor, &c.*, 92 id. 268; *Inman Steamship Co.* v. *Tinker*, 94 id. 238.

*Mr. Lyman D. Gilbert*, Deputy Attorney-General of Pennsylvania, *contra*.

The contention is between the Commonwealth and an auctioneer, as to a graduated tax upon his sales; a liability to pay which she annexed as a condition to the grant of authority to pursue his calling.

If it be asserted that the tax is laid upon the importer, and is paid by him, the auctioneer being merely the collector, the Commonwealth has the right to collect it from the latter, for he succeeds to no defence which the former might have made. *Waring* v. *The Mayor*, 8 Wall. 110.

The demand is made upon Cook not as an importer, but as an auctioneer, who, as an agent of the Commonwealth, received the tax in dispute, and holds it as her trustee. If he has not collected it, his failure to perform his agreement renders him liable.

Although the tax was not laid directly upon the importer, it is submitted that, if the contrary were true, the right of the Commonwealth to collect it is undoubted; because, first, no one can require the services of her officer, except upon her terms; second, she appointed Cook an auctioneer, investing him with certain privileges and subjecting him to certain responsibilities; and importers who for their own advantage avail themselves of his services, and of the security which she demands of him for his fidelity, cannot decline to pay the prescribed price fixed for his services, and for the benefit which such security affords. As was said by Mr. Chief Justice Marshall, in *Brown* v. *The State of Maryland* (12 Wheat. 437), "Auctioneers are persons licensed by the State, and if the importer chooses to employ them, he can as little object to paying for the service, as for any other for which he may apply to an officer of the State. The right of sale may very well be annexed to importation, without annexing to it also the privilege of using the officers licensed by the State to make sales in a particular way."

Whatever privileges, therefore, importers obtain not from

the United States, but exclusively from the Commonwealth, — among them being that of employing a licensed auctioneer, — are subject to her regulation, and to such taxation as she imposes. An increased price of foreign merchandise may result from the tax in question; but such a consequence follows many modes of taxation, and furnishes no reason against their validity. *Nathan* v. *Louisiana*, 8 How. 73; *State Tax on Railway Gross Receipts*, 15 Wall. 284.

The Commonwealth having the right to impose the tax in question, can determine the amount thereof and the manner in which it shall be laid. *State Tax on Railway Gross Receipts, supra; Society for Savings* v. *Coite*, 6 Wall. 594; *Provident Institution* v. *Massachusetts*, id. 611; *The Delaware Railroad Tax*, 18 id. 206.

MR. JUSTICE MILLER delivered the opinion of the court.

The act of the legislature of Pennsylvania, of May 20, 1853 (Pamphlet Laws, 683), declares that —

" The State duty to be paid on sales by auction in the counties of Philadelphia and Allegheny shall be on all domestic articles and groceries, one-half of one per cent; on foreign drugs, glass, earthenware, hides, marble-work, and dye-woods, three-quarters of one per cent."

By the sixth section of the act of April 9, 1859, the law was modified, as follows : —

" Said auctioneers shall pay into the treasury of the Commonwealth a tax or duty of one-fourth of one per cent on all sales of loans or stocks, and shall also pay into the treasury aforesaid a tax or duty, as required by existing laws, on all other sales to be made as aforesaid, except on groceries, goods, wares, and merchandise of American growth or manufacture, real estate, shipping, or livestock; and it shall be the duty of the auctioneer having charge of such sales to collect and pay over to the State treasurer the said duty or tax, and give a true and correct account of the same quarterly, under oath or affirmation, in the form now required by law." Pamphlet Laws, 436.

The effect of this legislation is, that by the first statute a discrimination of one-fourth of one per cent is made against

foreign goods sold at auction; and by the last statute, while all sales of foreign or imported goods are taxed, those arising from groceries, goods, wares, and merchandise of American growth or manufacture are exempt from such tax.

It appears that the law also required these auctioneers to take out a license, to make report of such sales, and to pay into the treasury the taxes on these sales.

The defendant refused to pay the tax for which he was liable under this law, for the sale of goods which had been imported and which he had sold for the importers in the original packages. In the suit, in which judgment was rendered against him in the Supreme Court of Pennsylvania, he defended himself on the ground that these statutes were void, because forbidden by sects. 8 and 10 of art. 1 of the Constitution of the United States.

The clauses referred to are those which give to Congress power to regulate commerce with foreign nations, and forbid a State, without the consent of Congress, to levy any imposts or duties on imports. The case stated shows that the goods sold by defendant were imported goods, and that they were sold by him in the packages in which they were originally imported. It is conceded by the Attorney-General of the State, that if the statute we have recited is a tax on these imports, it is justly obnoxious to the objection taken to it.

But it is argued that the authority of the auctioneer to make any sales is derived from the State, and that the State can, therefore, impose upon him a tax for the privilege conferred, and that the mode adopted by the statute of measuring that tax is within the power of the State. That being a tax on him for the right or privilege to sell at auction, it is not a tax on the article sold, but the amount of the sales made by him is made the measure of the tax on that privilege. In support of this view, it is said that the importer could himself have made sale of his goods without subjecting the sale to the tax. The argument is fallacious, because without an auctioneer's license he could not have sold at auction even his own goods. If he had procured, or could have procured, a license, he would then have been subject by the statute to the tax, for it makes no exception. By the express language of the statute, the auc-

tioneer is to collect this tax and pay it into the treasury. From whom is he to collect it if not from the owner of the goods? If the tax was intended to be levied on the auctioneer, he would not have been required first to collect it and then pay it over. It was, then, a tax on the privilege of selling foreign goods at auction, for such goods could only be sold at auction by paying the tax on the amount of the sales.

The question as thus stated has long ago and frequently been decided by this court.

In *Passenger Cases* (7 How. 283), a statute of New York was the subject of consideration, which required an officer of the city of New York, called the health commissioner, to collect from the master of every vessel from a foreign port, for himself and each cabin passenger on board his vessel, one dollar and fifty cents, and for each steerage passenger, mate, sailor, or mariner, one dollar. A statute of the State of Massachusetts was also considered, which enacted that no alien passengers (other than certain diseased persons and paupers, provided for in a previous section) should be permittted to land until the master, owner, consignee, or agent of such vessel should pay to the regularly appointed boarding officers the sum of two dollars for each passenger so landing. In both instances, although the master or the owner of the vessel was made to pay the sum demanded, it was held to be a tax on the passengers. It was he whose loss it was when paid, and the burden rested ultimately and solely on him. Mr. Chief Justice Taney says: "It is demanded of the captain, and not from every separate passenger, for the convenience of collection. But the burden evidently falls on the passenger, and he, in fact, pays it, either in the enhanced price of his passage, or directly to the captain, before he is allowed to embark for the voyage." Because it was such a tax, the majority of the court held it to be unconstitutional and void.

In the case of *Crandall v. State of Nevada* (6 Wall. 35), the State had passed a law requiring those in charge of all the stage-coaches and railroads doing business in the State to make report of every passenger who passed through the State or went out of it by their conveyances, and to pay a tax of one dollar for every such passenger. The argument was urged

there, that the tax was laid on the business of the railroad and stage-coach companies, and the sum of one dollar exacted for each passenger was only a mode of measuring the business to be taxed. . But the court said, as in *Passenger Cases*, that it was a tax which must fall on the passenger, and be paid by him for the privilege of riding through the State by the usual vehicles of travel.

In *Case of the State Freight Tax* (15 id. 232), Mr. Justice Strong says : " The case presents the question whether the statute in question — so far as it imposes a tax upon freight taken up within the State and carried out of it, or taken up outside the State and delivered within it, or, in different words, upon all freight other than that taken up and delivered within the State — is not repugnant to the provision of the Constitution of the United States." It was argued here again that the tax was one on the business and franchises of the railroad companies which were required to pay it; but the court, reviewing the authorities, said that the inquiry was upon what did the burden really rest, and not upon the question from whom the State exacted payment into its treasury. This language was abundantly supported by the cases concerning tax on the national banks; namely, *Bank of Commerce* v. *New York City*, 2 Black, 620; *Bank Tax Cases*, 2 Wall. 200; *Society for Savings* v. *Coite*, 6 id. 594; *Provident Institution* v. *Massachusetts*, id. 611.

In *Henderson* v. *The Mayor* (92 U. S. 259), where the owners of vessels from a foreign port were required to give a bond, as security, that every passenger whom they landed should not become a burden on the State, or pay for every such passenger a fixed sum, it was held to be in effect a tax of that sum on the passenger, however disguised by the alternative of a bond which would never be given. The court said, that "in whatever language a statute may be framed, its purpose must be determined by its natural and reasonable effect; and if it is apparent that the object of this statute, as judged by that criterion, is to compel the owners of vessels to pay a sum of money for every passenger brought by them from a foreign shore and landed at the port of New York, it is as much a tax on passengers, if collected from them, or a tax on

the vessel or owner for the exercise of the right of landing their passengers in that city, as was the statute held void in the *Passenger Cases*."

To the same effect, and probably more directly in point, is the case of *Welton* v. *State of Missouri* (91 id. 275), decided at the same term. In that case, pedlers were required, under a severe penalty, to take out a license; and those only were held to be pedlers who dealt in goods, wares, and merchandise which were not of the growth, produce, or manufacture of the State. The court, after referring to the case of *Brown* v. *Maryland*, relied on by defendant here, adds: " So, in like manner, the license tax exacted by the State of Missouri from dealers in goods which are not the product or manufacture of the State, before they can be sold from place to place within the State, must be regarded as a tax upon such goods themselves; and the question presented is, whether legislation, thus discriminating against the products of other States in the conditions of their sale by a certain class of dealers, is valid under the Constitution of the United States." And it was decided that it was not. See also *Waring* v. *The Mayor*, 8 Wall. 110.

The tax on sales made by an auctioneer is a tax on the goods sold, within the terms of this last decision, and, indeed, within all the cases cited; and when applied to foreign goods sold in the original packages of the importer, before they have become incorporated into the general property of the country, the law imposing such tax is void as laying a duty on imports.

In *Woodruff* v. *Parham* (8 Wall. 123) and *Hinson* v. *Lott* (id. 148), it was held that a tax laid by a law of the State in such a manner as to discriminate unfavorably against goods which were the product or manufacture of another State, was a regulation of commerce between the States, forbidden by the Constitution of the United States. The doctrine is reasserted in the case of *Welton* v. *State of Missouri, supra.* The Congress of the United States is granted the power to regulate commerce with foreign nations in precisely the same language as it is that among the States. If a tax assessed by a State injuriously discriminating against the products of a State of the Union is forbidden by the Constitution, a similar tax against goods imported from a foreign State is equally forbidden.

A careful reader of the history of the times which immediately preceded the assembling of the convention that framed the American Constitution cannot fail to discover that the need of some equitable and just regulation of commerce was among the most influential causes which led to its meeting. States having fine harbors imposed unlimited tax on all goods reaching the Continent through their ports. The ports of Boston and New York were far behind Newport, in the State of Rhode Island, in the value of their imports; and that small State was paying all the expenses of her government by the duties levied on the goods landed at her principal port. And so reluctant was she to give up this advantage, that she refused for nearly three years after the other twelve original States had ratified the Constitution, to give it her assent.

In granting to Congress the right to regulate commerce with foreign nations, and among the several States, and with the Indian tribes, and in forbidding the States without the consent of that body to levy any tax on imports, the framers of the Constitution believed that they had sufficiently guarded against the dangers of any taxation by the States which would interfere with the freest interchange of commodities among the people of the different States, and by the people of the States with citizens and subjects of foreign governments.

The numerous cases in which this court has been called on to declare void statutes of the States which in various ways have sought to violate this salutary restriction, show the necessity and value of the constitutional provision. If certain States could exercise the unlimited power of taxing all the merchandise which passes from the port of New York through those States to the consumers in the great West, or could tax — as has been done until recently — every person who sought the seaboard through the railroads within their jurisdiction, the Constitution would have failed to effect one of the most important purposes for which it was adopted.

A striking instance of the evil and its cure is to be seen in the recent history of the States now composing the German Empire. A few years ago they were independent States, which, though lying contiguous, speaking a common language, and belonging to a common race, were yet without a common government.

The number and variety of their systems of taxation and lines of territorial division necessitating customs officials at every step the traveller took or merchandise was transported, became so intolerable, that a commercial, though not a political union was organized, called the German Zollverein. The great value of this became so apparent, and the community of interest so strongly felt in regard to commerce and traffic, that the first appropriate occasion was used by these numerous principalities to organize the common political government now known as the German Empire.

While there is, perhaps, no special obligation on this court to defend the wisdom of the Constitution of the United States, there is the duty to ascertain the purpose of its provisions, and to give them full effect when called on by a proper case to do so.

The judgment of the Supreme Court of Pennsylvania will be reversed, and the case remanded for further proceedings, in conformity with this opinion; and it is

*So ordered.*