## THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v. JOHN C. WILMERDING, Defendant.

*Auctioneers — State tax upon their sales — the tax is not violative of the Federal Constitution — when it applies to foreign goods — presumption — payment with knowledge of the facts.*

Chapter 62 of the Laws of 1846, relative to duties payable to the State by an auctioneer upon goods imported from any place beyond the Cape of Good Hope, and upon all other goods which are the production of any foreign country, is still in force.

The legislation upon this subject since 1842 reviewed.

The general rule that the repeal of a later statute, repealing an earlier one, will revive the preceding law, is subject to the exception that where the statute repealed is re-enacted in such form as to embody a part of the preceding law by declaring in the amendatory statute that the statute amended shall read as follows, the earlier statute will not be restored. This exception is itself subject to the limitation that where, by other provisions of the amendatory statute, it is evident that it was the intention of the legislature that the original statute should be revived, such repeal will have the effect of restoring the original statute.

The statute of 1846 is not in conflict with subdivision 2 of section 10 of article 1 of the Constitution of the United States, declaring that "no State shall, without the consent of the congress, lay any imposts or duties on imports, or exports, except what may be absolutely necessary for executing its inspection laws."

This act does not apply to goods while they remain in the condition in which they were imported, but only applies to them after the original packages have been broken up and the goods have become a part of the general mass of property in the State.

The court will not presume that the legislature intended to enact a law which is in conflict with the Constitution of the United States.

In the case of imported goods sent by an importer to an auctioner in their original cases, and with the authority or consent of the importer sold by the auctioneer in parcels to different persons, after the cases have been broken open, the auctioneer is subject to the payment of the State tax.

Payments of auction duties made with full knowledge of the facts and without coercion upon the part of the State authorities, though made under protest, cannot be recovered.

SUBMISSION of a controversy upon an agreed statement of facts under the provisions of article 2 of title 2 of chapter 11 of the Code of Civil Procedure.

*W. A. Poste*, for the plaintiff.

*Daniel P. Hays*, for the defendant.

DANIELS, J. :

The controversy, which in this manner has been submitted to the court, relates to the obligation of the defendant, as an auctioneer in the city of New York, to return and pay auction duties to the State of New York, and also to the claim of the defendant to recover back auction duties previously paid by him under protest. This latter part of the case requires but little attention for its disposition, for the moneys were paid as auction duties, so far as those payments have been made, with a full knowledge of the facts and without any coercion on the part of the State authorities. And where a payment is made in that manner, although it may be accompanied with the protest of the party paying, the law does not permit the money to be recovered back. (*Flower* v. *Lance*, 59 N. Y., 603; *Vanderbeck* v. *City of Rochester*, 122 id., 285.)

Goods and merchandise were sold by the defendant, as auctioneer, which were the products of foreign countries imported into the United States, upon which, at the rate of three-fourths of one per cent, the auction duties claimed amount to the sum of $133.06, besides interest. And this balance is claimed by the plaintiff from the defendant under the authority of the laws of this State relating to auction sales. This law, as it was made a part of the

Revised Statutes, is contained in title 1, chapter 17, part 1. These provisions, so far as they defined the auction duties, were superseded or repealed by chapter 62 of the Laws of 1846. The first section of this act defined the duties payable to the State by an auctioneer on all goods, wares, merchandise and effects imported from any place beyond the Cape of Good Hope, and all other goods, wares, merchandise and effects which are the production of any foreign country, and plainly prescribed and regulated the obligations of auctioneers to the State But, by chapter 547 of the Laws of 1866, these provisions were re-enacted with certain changes not required to be noticed for the disposition of this proceeding. By the peculiar phraseology adopted in the act of 1866, it was provided that section 1 of the act of 1846, which prescribed the duties to be paid, was thereby amended so as to read as follows, and then followed the newly enacted law. And, by chapter 106 of the Laws of 1868, this act of 1866 was, in express terms, repealed. And no provisions were then enacted or made creating or prescribing any obligation on the part of an auctioneer to pay auction duties to the State upon the goods and merchandise mentioned in the act of 1846. And for that reason it has been insisted, on behalf of the defendant, that he has been relieved from the obligation of paying auction duties, under the application of the rule that the repealing of the statute in this manner, embodying a preceding law, does not of itself revive that law. Generally speaking, the rule is otherwise, and the repeal of a later statute repealing an earlier statute will revive the preceding law, and reinstate it from that time in the same manner as though it had not been repealed. (*Van Denburgh* v. *President, etc., of Greenbush*, 66 N. Y., 1.)

But an exception to this rule is stated to exist where the statute repealed is re-enacted in such form as to embody a part of the preceding law, as the law of 1866 amended the act of 1846, by declaring by the amendment that it should read as follows, etc. (*People* v. *Supervisors*, 67 N. Y., 109.) And if no more had been done than to repeal the act of 1866 framed in this manner, the construction might be required to be adopted that no law existed after that, obligating an auctioneer to pay auction duties on the sale of merchandise to the State.

But in this respect, as in others where the intention of the legislature can be ascertained, that intention is to be adopted and followed. And it appears, by the second section of the act of 1868, that it was not the understanding of the legislature that the repeal of the act of 1866 should be attended with the result of abrogating the obligation to pay auction duties upon the sale of goods and merchandise. This section amended section 2 of chapter 399 of the Laws of 1849, authorizing the comptroller to appoint an agent still to carry the law into effect. And by the amendment of 1868 it was provided that the agent employed should have full power to administer an oath to each auctioneer, and to require such information as might be necessary to ascertain the true amount of goods sold at auction by such auctioneer. And a fee for the agent was prescribed for approving the returns to be made of sales. This section clearly discloses the intention of the legislature to be, notwithstanding the repeal of the act of 1866, that the preceding law should still be applied and enforced. And this intention is still further manifested by chapter 287 of the Laws of 1878, which excepts the sale of farm property and other personal property sold upon farms, and property which may be owned by any person residing in any of the towns and villages of this State, and which has not been purchased for the purpose of a sale at auction, upon which duties are required to be paid to the comptroller under the laws of this State, from " the semi-annual account now required by law, to be rendered to the comptroller, by auctioneers engaged in the sale of goods, wares, merchandise and effects, the growth or produce of any foreign country." And the only law to which this reference could have been intended to be made, as the act of 1866 had been repealed, must have been that of chapter 62 of the Laws of 1846, which by its third section declared that the account required by law from every auctioneer should thereafter be rendered semi-annually on the first Mondays of July and January in each year.

It is also apparent, from this act of 1878, that the legislature understood the laws of the State still to require the payment of auction duties upon the sale of goods, wares, merchandise and effects, the growth or produce of foreign countries, as that was regulated by the act of 1846, and previously had been by the part of the Revised Statutes already mentioned. Chapter 310 of the Laws of 1883 is

still further significant upon this subject, for it made an important amendment to section 3 of chapter 547 of the Laws of 1866, which, by chapter 106 of the Laws of 1868, had been expressly repealed. This amendment prohibited any auctioneer from executing the duties of his office until he gave a bond to the people of the State, with two sureties, in the penalty of $5,000, in cities having a population of more than 50,000 inhabitants, for the faithful performance of the duties of his office, and for the payment of the fees or duties that are or shall be imposed by law, and that shall have accrued on sales made by him, or under his direction, by virtue of his office, assuming plainly, by its provisions and directions, that an auctioneer selling goods, wares and merchandise still remained subject to the payment of auction duties to the State. And this exhibition of the intention of the legislature, although given in this awkward manner, is consistent with no other conclusion than that it was intended in the repeal of the act of 1866 that the preceding law of 1846 should be revived and continue to apply to the occupation of auctioneers selling goods, wares and merchandise. The defendant, accordingly, cannot be relieved from the obligation to pay auction duties to the State.

But his liability to make the payment of the duties claimed from him is further resisted under subdivision 2 of section 10, article 1 of the Constitution of the United States, which declares that: "No State shall, without the consent of the congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws." And as the goods and merchandise upon which the duties are now exacted by the State were the products of foreign countries imported into the United States, this provision of the Constitution is invoked as excluding the defendant's liability. The law, as it has been expressed in the act of 1846, and as it was previously contained in the Revised Statutes of the State, has not, by its language, provided for the payment of duties upon imported merchandise brought into the United States prior to the time when such merchandise shall become a part of the mass of the property of the State. It does, it is true, mention goods, wares, merchandise and effects imported from any place beyond the Cape of Good Hope, and other goods, wares, merchandise and effects the production of any foreign country. But this language is not to

be construed as intended to include the imported articles while they may remain in the condition in which they are imported. That would be a violation of this constitutional provision. And it is not to be presumed that the legislature intended by the enactment to bring it in conflict with the Constitution of the United States. The presumption, on the contrary, is that it was intended to enact the law in such language as to permit its enforcement without creating a conflict between its provisions and the Constitution. (*Newell* v. *People*, 3 Seld., 9, 109.)

Such is the presumption required to be applied in support of legislative enactments. For, inasmuch as they are made with knowledge on the part of the members of the legislature of the constitutional restraints obligatory upon them, it is to be assumed that the intention is to avoid conflict with the provisions of the Constitution. Upon this subject it was said in *United States* v. *Coombs* (12 Peters, 72) that, "If the section admits of two interpretations, one of which brings it within, and the other presses it beyond the constitutional authority of congress, it will become our duty to adopt the former construction; because a presumption never ought to be indulged that congress meant to exercise or usurp any unconstitutional authority, unless that conclusion is forced upon the court by language altogether unambiguous." (Id., 76.) And this rule is as applicable to the legislation of the State as it is to the legislation of congress.

In *Butler* v. *Commonwealth of Pennsylvania* (10 How. [U. S.], 402) it was added that: "It has been repeatedly said by this court that to pronounce a law of one of the sovereign States of this Union to be a violation of the Constitution is a solemn function demanding the gravest and most deliberate consideration; and that a law of one of the States should never be so denominated, if it can upon any other principle be correctly explained." (Id., 415.) And the frequent repetition and long continuance of the laws of the State prescribing and requiring the payment of auction duties upon the sale of this character of goods, merchandise and effects, is still further weighty evidence in support of the conclusion that the laws have not been so enacted as to be brought in conflict with this provision of the Constitution of the United States. (*People ex rel. Williams* v. *Dayton*, 55 N. Y., 367.)

The language of the statute will be fully satisfied by applying it to the control of such sales of imported merchandise after it has passed beyond the protection of the Constitution and laws of the United States, and become a part of the general mass of State property. For these reasons it cannot be held that the law itself, as it now exists, was an unconstitutional exercise of legislative power. Whether it applies to the present controversy is to be determined by the status or condition of the property upon which the duties have been exacted at the time when the sales were made by the defendant.

By the agreed case, the defendant sold goods, merchandise and effects imported into the United States from foreign countries to the amount, in the aggregate, of $17,741.74. And it has been agreed by the case that these sales " represent goods originally imported and sent by the importer in the original imported packing cases to John C. Wilmerding for sale, but which goods were not sold by the said John C. Wilmerding, as auctioneer, in the original packing cases, but the said packing cases were opened and the goods were sold as follows, for example, a case of woolens or silks contained a certain number of pieces of woolens or silks, each containing the same number of yards, and each being a separate package, piece, parcel or bundle by itself. The separate package, piece, parcel or bundle was sold at auction to retail dealers or jobbers apart from the other contents of said entire case, said package, piece, parcel or bundle not being opened or separated. The cases containing ribbons and trimmings consisted of a large number of boxes or cartons of trimmings or ribbons; a carton being a box containing a number of rolls of ribbon. The whole case was not sold by auction to one person, but the case was opened and the separate boxes or cartons were sold by the auctioneer to different retail dealers or jobbers, said boxes or cartons not being opened or separated."

The sales, accordingly, were not made of the goods in the packages in which they were imported under the Constitution and the laws of congress. Where the articles, as they are imported by the importer, are made the subject of sale, there it is clear that the State would not be entitled to exact a duty for the sale itself, although it may be made by an auctioneer as a State officer. This subject was considered very critically, as well as thoroughly, in *Brown* v. *State*

*of Maryland* (12 Wheat., 419).   But in that case the State of Mary-
land prohibited the sale of the goods as imported, unless the importer
first obtained a license permitting the sale to be made.   And that
applied to the packages themselves as they should be brought into
the country by the importer.   And it was there said, in the opinion
of Chief Justice MARSHALL in defining an exception to the rule
prescribed, that "It is sufficient for the present to say, generally,
that when the importer has so acted upon the thing imported, that
it has become incorporated and mixed up with the mass of property
in the country, it has, perhaps, lost its distinctive character as an
import, and has become subject to the taxing power of the State.
But while remaining the property of the importer in his warehouse
in the original form, or package in which it was imported, a tax
upon it is too plainly a duty on imports to escape the prohibition in
the Constitution."   (Id , 441.)   It was suggested, in the course of
the decision, however, that if the importer employed a licensed
auctioneer of the State to make the sales, that he could not object
to paying for that service, or for any other for which he might
apply to an officer of the State.   But, so far as this intimation
extended, it has been practically overruled by the case of *Cook* v.
*Pennsylvania* (97 U. S., 566).   But this latter case is still undecisive
of the present controversy, for the reason that the goods for which the
auction duties were there exacted were sold in the bulk or original
packages in which they had been imported.   And there can be no
doubt, following the construction in this manner placed upon the
Constitution, as well as from its express language, that sales of the
imported articles in the packages in which the importations may be
made are free from all liability to the State for duties claimed
to be imposed upon the privilege of making the sale itself.

But where the packages may be broken up and divided into
smaller quantities, and practically sold out at retail, as they were by
the auctioneer in this case, there they have been considered to have
passed so far beyond this constitutional provision as to entitle the
States, in the exercise of their sovereign authority, to levy a duty
upon the sales which in that manner shall be made.   This was con-
sidered in *People* v. *Maring* (3 Keyes, 374) where in the course
of the opinion, which secured the approval of the court, it was
said, that "there can be no doubt of the power of a State to tax

articles which have been imported for sale, after they have passed into the mass of general property by being sold by the importer, either for consumption or resale, or by being divided by him into smaller quantities by the breaking up of the casks or packages in which they were imported, so as to destroy the character of import which subjected them to duties under the laws of the United States." (Id., 375.) And in this case it is not contended that this destruction of the packages and the detailed sales made of the goods were not under the authority of the importer. Neither is it to be presumed that the auctioneer without that authority divided and sold the goods in this manner. For that would have been a wrong upon his part, and the law does not presume a wrong without evidence against any person. The same qualification of the law was also declared in Waring v. Mayor, etc. (8 Wall., 110), where, in the course of the opinion of the court, it was said, that "When the importer sells the imported articles, or otherwise mixes them with the general property of the State by breaking up the packages, the state of things changes, as was said by this court in the leading case, as the tax then finds the articles already incorporated with the mass of property by the act of the importer." (Id. 122.) And this was approved of in Low v. Austin (13 Wall., 29.) There it was said that "whilst retaining their character as imports, a tax upon them, in any shape, is within the constitutional prohibition. The question is not as to the extent of the tax, or its equality with respect to taxes on other property, but as to the power of the State to levy any tax. If at any point of time between the arrival of the goods in port and their breakage from the original cases, or sale by the importer, they become subject to State taxation, the extent and the character of the tax are mere matters of legislative discretion." (Id., 34.) And so the rule was considered in Coe v. Errol (116 U. S., 517). It was there said that "the State cannot impose any tax or duty on such goods so long as they remain the property of the importer, and continue in the original form or packages in which they were imported." (Id., 526-7.) And the still later case of Leisy v. Hardin (135 U. S., 100) sanctions the same construction.

The facts, as they have been disclosed by the agreed case, exhibit as complete a destruction of the original packages imported, as would

have been the case if the importer himself had been engaged in a wholesale or retail business, and had divided and placed these goods for sale in their appropriate places upon the shelves of his establishment. They had proceeded a step beyond that, where the Constitution has carried its protection against State taxation. And the defendant was, therefore, liable under the provisions of the statute of this State to pay to the State the sum of money demanded by it as the statutory duties upon these sales. The plaintiff is, accordingly, entitled to judgment to that effect, together with interest and the costs allowed by law.

Van Brunt, P. J., and Barrett, J., concurred.

Judgment for plaintiff, with costs.