[Sac. No. 5640. In Bank. Nov. 1, 1945.]

RICHFIELD OIL CORPORATION (a Corporation), Respondent, v. STATE BOARD OF EQUALIZATION, Appellant.

Robert W. Kenny, Attorney General, H. H. Linney, Assistant Attorney General, Adrian A. Kragen and John L. Nourse, Deputies Attorney General, for Appellant.

Robert E. Paradise, Norman S. Sterry and Gibson, Dunn & Crutcher for Respondent.

CARTER, J.—This is an appeal from a judgment for plaintiff in an action to recover retail sales tax paid under protest. ■ Plaintiff, a corporation, is engaged in producing and selling oil and oil products in California. The New Zealand Government for use by its navy invited offers to sell oil to it for delivery "f.o.b. N.Z. Government tank steamer at any port beyond New Zealand specified by the tenderer." Plaintiff, in the course of its business, submitted an offer with the price quoted f.o.b. ship's rail of buyer's tanker at its storage terminal at Long Beach, California. Pursuant thereto a contract of sale was executed specifying that "(1) Price . . . f.o.b. Los Angeles, payment in London, . . . (3) Delivery shall be given to the order of the Naval Secretary, Navy Office, Wellington, *into N. Z. Naval tank steamer* R.F.A. 'Nucula' *at Los Angeles, California.* . . .

"(7). The Richfield Oil Co. shall advance to the Master of the 'Nucula' at Los Angeles a sum in dollars the equivalent of up to £300 to meet disbursements at port of loading on each trip, such advance to be repaid when payment is made for the fuel oil.

"(8). Bills of Lading and other customary shipping documents shall be handed to the Master of the 'Nucula' and the oil consigned to the Naval-Officer-In-Charge, Auckland, New Zealand."

Pursuant to the contract plaintiff delivered oil from its storage tanks into the "Nucula" at Long Beach, California. Documents including a bill of lading naming plaintiff as shipper and stating that delivery would be made to the naval

officer at Auckland, New Zealand, were delivered to the master of the vessel. Plaintiff also executed a shipper's export declaration, naming it as shipper. The oil reached New Zealand and was paid for in London. It is conceded that title to the oil passed to the buyer when plaintiff delivered it into the tanker at Long Beach, California.

The trial court found the following facts in addition to the foregoing: That oil had never been produced in New Zealand in sufficient quantities for that country's needs, and plaintiff had made other sales of oil to the buyer under similar circumstances; that the parties intended that the oil would be exported to the buyer without interruption.

Clearly, the sale here involved, falls within the provision of the California sales tax law. It levies a tax, measured by gross receipts, on retailers "for the privilege of selling tangible personal property at retail . . . ." (Rev. & Tax. Code, §§ 6051, 6052.) The retailers are authorized to collect the tax from the consumers. (Rev. & Tax. Code, §§ 6051, 6052.) A sale is "any transfer of title or possession, . . . in any manner or by any means whatsoever, of tangible personal property for a consideration, . . . ." (Rev. & Tax Code, §6006.) In the present case the transfer of possession and title took place in California.

In construing the above statutory provisions it has been definitely and squarely held by the courts of this state that:

"The tax being a direct obligation of the retailer and, so far as the consumer is concerned, a part of the price paid for the goods and nothing else, it is neither in fact nor in effect laid upon the consumer. It does not become a tax on the sale nor because of the sale, but remains an excise tax for the privilege of conducting a retail business measured by the gross receipts from sales." (*Western L. Co.* v. *State Board of Equalization,* 11 Cal.2d 156, 164 [78 P.2d 731, 117 A.L.R. 838]; see also *National Ice etc. Co.* v. *Pacific F. Exp. Co.,* 11 Cal.2d 283 [79 P.2d 380]; *De Aryan* v. *Akers,* 12 Cal. 2d 781 [87 P.2d 695]; *Standard Oil Co.* v. *Johnson,* 10 Cal. 2d 758 [76 P.2d 1184]; *Roth Drug Inc.* v. *Johnson,* 13 Cal. App. 2d 720 [57 P.2d 1022].)

Plaintiff invokes the Constitution of the United States as a bar to the collection of the tax. "The Congress shall have power . . . . To regulate Commerce with foreign Nations, and among the several States . . . .", (U. S. Const., art. I, § 8, cl. 3). "No Tax or Duty shall be laid on Articles

exported from any State." (U. S. Const., art. I, § 9, cl. 5.) "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws: and the net Produce of all Duties and Imposts, laid by any State on Imports or Exports, shall be for the Use of the Treasury of the United States; and all such Laws shall be subject to the Revision and Control of the Congress." (U. S. Const., art. I, § 10, cl. 2.)

It should be clear that the sales tax imposed in the instant case does not violate the United States Constitution. There is no discrimination penalizing the sale of goods that are exported to the advantage of sales in local or intrastate transactions. The tax falls equally on all transactions without distinction. The tax is not on export business as such nor on the articles in export. Thus, the only theory upon which it may be said that the tax cannot be applied here is, that the property had already been launched upon its export journey when the sale was consummated and the tax attached to the sale, or, stated another way, the sale was an inseparable part of the exportation and therefore could not be subject to the tax. But here the delivery of the oil which resulted in the passage of title, and the completion of the sale, and the taxable incident, occurred prior to the commencement of the exportation. The delivery of the oil was to the buyer's vessel not a common carrier. The vessel was in California waters and was not bound for any destination until it started to move from the port. It became the property of the buyer before any movement in the channels of commerce occurred. If it had been delivered to a common carrier of export products a different result might be appropriate, for then it would have been placed in the hands of an instrumentality whose *sole purpose* is to export goods, thus indelibly characterizing the process as a part of exportation. Suppose a citizen of Mexico entered this country and purchased a banjo in a store a mile from the border with the unequivocal intent to take it back to Mexico with him and he did so. Would it be doubted that the retailer would be required to pay a tax on the sale? Would the result be any different if the Mexican came by his automobile and either he or the retailer for him placed the banjo in the car? Nor would the conclusion be altered if he gave the retailer an affidavit that he was taking the banjo to Mexico.

When a general tax is levied on all property alike, goods not intended for export are not immune because they are later exported. (*Brown* v. *Houston*, 114 U.S. 622 [5 S.Ct. 1091, 29 L.Ed. 257].) Nor are goods exempt from such tax on the ground that they are intended for exportation or manufactured under a contract for export. (*Turpin* v. *Burgess*, 117 U.S. 504 [6 S.Ct. 835, 29 L.Ed. 988]; *Cornell* v. *Coyne*, 192 U.S. 418 [24 S.Ct. 383, 48 L.Ed. 504].) It has been said that goods exported to a foreign country do not lose their character as a part of the common mass of property in the state from which exported "until they have been shipped, or entered with a common carrier for transportation to another State, or have been started upon such transportation in a continuous route or journey." (*Coe* v. *Errol*, 116 U.S. 517, 527 [6 S.Ct. 475, 29 L.Ed. 715].) And also that " 'Whenever a commodity has *begun to move* as an article of trade from one State to another, commerce in that commodity between the States has commenced.' " But *this movement does not begin until the articles have been shipped or started for transportation* from the one State to the other. The carrying of them in carts or other vehicles, or even floating them, to the depot where the journey is to commence is no part of that journey. That is all preliminary work, performed for the purpose of putting the property in a state of preparation and readiness for transportation. Until actually launched on its way to another State, or committed to a common carrier for transportation to such State, its destination is not fixed and certain." (Emphasis added.) (*Coe* v. *Errol*, *supra*, at p. 528.)

The cases of *A. G. Spalding & Bros.* v. *Edwards*, 262 U.S. 66 [43 S.Ct. 485, 67 L.Ed. 865], and *Crew-Levick Co.* v. *Pennsylvania*, 245 U.S. 292 [38 S.Ct. 126, 62 L.Ed. 295], do not compel a different result. In the Spalding case the property had commenced its journey by being committed to a common carrier, an instrumentality whose sole function is transportation in commerce. Hence, when it was delivered to the carrier the process of exportation had begun. In any event both the Spalding case and the Crew-Levick case must be considered as expressing narrow views with reference to the field of state taxation which have been superseded by the recent decisions of the United States Supreme Court. In that connection it should be noted that in the Crew-Levick case, the argument was based upon both the ban against state

imposition of imposts on exports and the power over foreign commerce, yet the court treated the case as a proper one for applying the rules applicable to state taxes where interstate commerce is involved. The court stated: "The bare question, then, is whether a state tax imposed upon the business of selling goods in foreign commerce, . . . is in effect a regulation of foreign commerce or an impost upon exports, within the meaning of the pertinent clauses of the Federal Constitution. Although dual in form, the question may be treated as a single one, since it is obvious that, for the purposes of this case, an impost upon exports and a regulation of foreign commerce may be regarded as interchangebale terms." (*Crew-Levick Co.* v. *Pennsylvania, supra,* 295.) And after discussing authorities dealing with interstate commerce, it is said: "Most of these cases related to interstate commerce, but there is no difference between this and foreign commerce, so far as the present question is concerned." (*Crew-Levick Co.* v. *Pennsylvania, supra,* 296; see also *Brown* v. *Maryland,* 12 Wheat. (U. S.) 419 [6 L.Ed. 678]; but see *Sonneborn Bros.* v. *Cureton,* 262 U.S. 506 [43 S.Ct. 643, 67 L.Ed. 1095].)

The new approach to the problem of the collision between state taxation and interstate commerce has been developed in many authorities. (See *Western Live Stock* v. *Bureau of Revenue,* 303 U.S. 250 [58 S.Ct. 546, 82 L.Ed. 823, 115 A.L.R. 944]; *J. D. Adams Mfg. Co.* v. *Storen,* 304 U.S. 307 [58 S.Ct. 913, 82 L.Ed. 1365, 117 A.L.R. 429]; *Gwin, White & Prince, Inc.* v. *Henneford,* 305 U.S. 434 [59 S.Ct. 325, 83 L.Ed. 272]; *McGoldrick* v. *Berwind-White Coal Min. Co.,* 309 U.S. 33 [60 S.Ct. 388, 84 L.Ed. 565, 128 A.L.R. 876]; *Wisconsin* v. *J. C. Penney Co.,* 311 U.S. 435 [61 S.Ct. 246, 85 L.Ed. 267, 130 A.L.R. 1229]; *Department of Treasury* v. *Wood Preserving Corp.,* 313 U.S. 62 [61 S.Ct. 885, 85 L.Ed. 1188]; *International Harvester Co.* v. *Dept. of Treasury,* 322 U.S. 340 [64 S. Ct. 1019, 1030, 88 L.Ed. 1313]; *McLeod* v. *J. E. Dilworth Co.,* 322 U.S. 327, 349 [64 S.Ct. 1023, 1030, 88 L.Ed. 1304, 1319]; *General Trading Co.* v. *Tax Com.,* 322 U.S. 335 [64 S.Ct. 1028, 88 L.Ed. 1309].) The essence of these decisions is recognition that not all state taxation is to be condemned because, in some manner, it has an effect upon interstate commerce, and recognition that there may be local activities by a taxpayer within a state, which may be sufficient to support a tax independent of the character of the transaction as a whole, and though the tax may have some inci-

dental effect on other than the purely local or intrastate aspects of that commerce. For illustration in *McGoldrick* v. *Berwind-White Min. Co., supra,* a New York City tax upon the sale of goods for consumption was upheld as applied where a Pennsylvania corporation engaged in the production of coal in Pennsylvania delivered it to its customers in New York. The tax was held to be conditioned upon events occurring within the state—delivery or the transfer of title or possession. It was said that not all state taxation is to be condemned because, in some manner, it has an effect upon commerce, and it is only when the tax operates to regulate commerce between the states to an extent that infringes the authority of Congress that the tax can be said to exceed constitutional limitations.

In *Department of Treasury* v. *Wood Preserving Corp.,* 313 U.S. 62 [61 S.Ct. 885, 85 L.Ed. 1188], the Indiana Gross Income Tax Act of 1933 was upheld as applied to a foreign corporation engaged in the business of purchasing railroad ties and selling them to purchasers with whom it had a contract for treating the ties by creosoting them. As to the dealings in question it appeared that the taxpayer purchased and received the ties from local producers in Indiana and sold them to the Baltimore & Ohio Railroad Company, making delivery f.o.b. cars on the railroad tracks in Indiana, pursuant to contract. The ties were then forthwith transported to Ohio for treatment. It was held that the tax was predicated upon local transactions which were none the less intrastate because the ties were intended for interstate shipment. It was pointed out that the taxpayer did not pay the freight for the transportation and that there was a completed delivery to the railroad company in Indiana.

*General Trading Co.* v. *Tax Com., supra,* involved an Iowa use tax. A sale of property was made in Minnesota to Iowa customers, the contract of sale being completed in Minnesota and the goods delivered to a common carrier there for shipment to Iowa.

The case of *International Harvester Co.* v. *Dept. of Treasury, supra,* concerned an Indiana tax levied on gross receipts from sales, particularly dealing with "(1) sales by out-of-State branches to Indiana dealers and users, where delivery it taken at plants of the corporation in Indiana; (2) sales to out-of-State buyers who come to Indiana, take delivery there, and transport the goods to another State; (3) sales

in Indiana to Indiana buyers, where the goods are shipped from out-of-State points to the buyer.'' (322 U.S. 340.)

Under the foregoing authorities it is perfectly clear that had this been an interstate transaction it would have been subject to tax. It is inconceivable that the framers of the Constitution ever intended that the export-import clause should be used to discriminate against the states.

Reference is made to *Hooven & Allison Co.* v. *Evatt,* 324 U.S. 652 [65 S.Ct. 870, 89 L.Ed. 1252] where Ohio sought to tax property imported by the taxpayer from the Philippine Islands while it was still in its original package and was held by the importer for manufacture. It was held not taxable but the court was particularly concerned with the original package doctrine and by applying it concluded that the importation had not ended. In the instant case the export had not begun and we have no question of the invocation of that doctrine. Moreover, it is difficult to ascertain the precise holding of that case inasmuch as the opinion written by Mr. Chief Justice Stone, held two things: (1) That the shipment from the Philippine Islands was an import because that territory was not a part of this country and hence the provision against imposts on imports applied, and; (2) That the property was not taxable under that provision. Justices Black, Douglas, Rutledge and Murphy dissented on the second point. Although Mr. Justice Reed apparently joined in the judgment reversing the state court's conclusion of taxability, he dissents on the first issue and his reasoning is of the character generally found in discussions as to the validity of state taxes where interstate commerce is involved.

In the instant case the tax imposed was a uniform non-discriminatory excise tax on the privilege of doing business in this state. The transaction which was the basis for the tax was the sale of oil which was produced, refined, stored and delivered to the purchaser in this state. The tax imposed was in no sense a tax on exports and became effective before the oil started on its export journey. For these reasons it is clear that the tax was not imposed in violation of any of the provisions of the Constitution of the United States, and is therefore valid.

The judgment is reversed.

Shenk, J., Schauer, J., Spence, J., and Peters, J., pro tem, concurred.

GIBSON, C. J.—I dissent.

Under the prevailing decisions of the United States Supreme Court the tax imposed in the present case is prohibited by the "import-export" clause of the Constitution of the United States which provides that "No State shall . . . lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws. . . ." (Art. I, § 10, cl. 2.) Since the question is entirely one of federal law, we are bound by those decisions.

It is admittedly difficult to ascertain the precise point at which the products of a state which are exported to foreign countries cease to be a part of the general mass of property of that state, subject to nondiscriminatory taxation as such, and become "exports" entitled to the constitutional protection against the imposition of taxes or duties. Clearly, where a general tax is laid on all property alike, goods not then intended for export are not exempt because they happen to be exported afterwards. (*Brown* v. *Houston,* 114 U.S. 622 [5 S.Ct. 1091, 29 L.Ed. 257].) And, goods are not exempt from such taxation merely because they are intended for exportation or manufactured under a contract for export. (*Turpin* v. *Burgess,* 117 U.S. 504 [6 S.Ct. 835, 29 L.Ed. 988]; *Cornell* v. *Coyne,* 192 U.S. 418 [24 S.Ct. 383, 48 L.Ed. 504].) On the other hand, goods in the actual course of transportation to a foreign destination and goods delivered to a common carrier for that purpose are in the process of exportation and constitutionally cannot be taxed. (*A. G. Spalding & Bros.* v. *Edwards,* 262 U.S. 66 [43 S.Ct. 485, 67 L.Ed. 865]; see *William E. Peck & Co.* v. *Lowe,* 247 U.S. 165, 175 [38 S.Ct. 432, 62 L.Ed. 1049]; *Turpin* v. *Burgess, supra,* at p. 506; *Coe* v. *Errol,* 116 U.S. 517, 527 [6 S.Ct. 475, 29 L.Ed. 715].) It was said in *Coe* v. *Errol, supra,* that goods exported to a foreign country do not cease to be part of the common property of the state of their origin for tax purposes until they "have been shipped or entered with a common carrier for transportation . . . or have been started upon such transportation in a continuous route or journey." (*Cf. Railroad Commission* v. *Texas & P. Ry. Co.,* 229 U.S. 336 [33 S.Ct. 837, 57 L.Ed. 1215]; *Texas & N. O. R. R. Co.* v. *Sabine Tram. Co.,* 227 U.S. 111 [33 S.Ct. 229, 57 L.Ed. 442]; *Southern P. Terminal Co.* v. *Interstate Commerce Com.,* 219 U.S. 498 [31 S.Ct. 279, 55 L.Ed. 310].)

Applying these general principles or formulas to the facts of the present case, it seems reasonably clear that the sale of the oil, under terms requiring delivery to the ship of a foreign government, at which time title passed, was a step in its exportation. The case of *A. G. Spalding & Bros.* v. *Edwards,* 262 U.S. 66 [43 S.Ct. 485, 67 L.Ed. 865], is particularly pertinent here. In that case a Venezuelan firm requested New York commission merchants to buy certain sporting goods for their account. The commission merchants ordered the goods from plaintiff Spalding, instructing it to deliver the same to a specified exporting carrier in New York addressed to the Venezuelan firm. The plaintiff delivered the goods as directed and received a receipt from the carrier which it sent to the commission merchants, who exchanged it for a bill of lading in their own name. The commission merchants paid plaintiff and in due time the goods were transported and delivered to the firm in Venezuela. In holding that a tax based on that sale could not constitutionally be imposed upon plaintiff, the court stated, at page 69, in language equally applicable to the case at bar, ''The very act that passed the title, and that would have incurred the tax had the transaction been domestic, committed the goods to the carrier that was to take them across the sea, for the purpose of export, and with the direction to the foreign port upon the goods. The expected and accomplished effect of the act was to start them for that port.''

It is true that the Spalding case involved section 9, clause 5, of the Constitution, which prohibits Congress from laying taxes on articles exported from any state, rather than section 10, clause 2, but it has been repeatedly said that the prohibitions of those sections are identical. (*Turpin* v. *Burgess,* 117 U.S. 504, 506 [6 S.Ct. 835, 29 L.Ed. 988]; *Brown* v. *Maryland,* 12 Wheat. (U.S.) 419 [6 L.Ed. 678].) An effort is made to distinguish that case on the ground that the delivery there involved was to a common carrier, while the delivery in the present case was to the purchaser's carrier. This distinction is one of form rather than substance. Delivery of goods to a common carrier for transportation is regarded as the beginning of the export journey because the destination of the goods is thereby fixed and certain. (*Cf. Turpin* v. *Burgess, supra,* at p. 507; *Superior Oil Co.* v. *Mississippi,* 280 U.S. 390, 396 [50 S.Ct. 169, 74 L.Ed. 504]; *Coe* v. *Errol,* 116 U.S. 517, 527 [6 S.Ct. 475, 29 L.Ed. 715].) But delivery of the oil to the ''Nucula'' in this case as effectively fixed its

destination as did the delivery of the goods to the common carrier in the Spalding case. Here, as there, title passed upon delivery, and the passage of title enables the purchaser to change the destination of goods and thereby evade the tax. But, as stated in the Spalding case, "There was not the slightest probability of any such change and it did not occur," and "theoretical possibilities may be left out of account." (262 U.S. at p. 70.) The law is not concerned with the means of shipment except to inquire whether the means chosen reasonably guarantees continuity of the export journey and foreign delivery in good faith. The means selected in this case, in light of all the circumstances, satisfies that inquiry. The only local phase of the sale was the delivery to the carrier in this state, and that delivery was the first step in the exportation. Under the Spalding case, to fix the step at which articles would be exempt from taxation "at any later point would fail to give the exports the liberal protection that hitherto they have received." (262 U.S. at p. 70.)

In some respects it would be more difficult to justify imposition of the tax in the present case than in the Spalding case because here the alleged local transaction was a direct sale to the foreign consumer and the oil was actually loaded aboard the carrier, whereas in the Spalding case the sale was to an intermediary and the goods were merely delivered to the carrier.

The contention that the constitutional prohibition against state taxation of exports does not apply to exports originating in taxing states is answered by the decision in *Crew-Levick Co.* v. *Pennsylvania,* 245 U.S. 292 [38 S.Ct. 126, 62 L.Ed. 295], where the State of Pennsylvania unsuccessfully sought to tax exports originating in that state. While it may be conceded that article I, section 10, clause 2, was conceived in the desire to prevent the seaboard states from exacting tribute from their sister states (see *Cook* v. *Pennsylvania,* 97 U.S. 566, 574 [24 L.Ed. 1015]; *Woodruff* v. *Parham,* 8 Wall. (75 U.S.) 123, 134, 135 [19 L.Ed. 382]), the provision is general in its terms.

The prohibition of the federal Constitution, as interpreted by the United States Supreme Court, is not rendered inapplicable on the theory that the California statute levies the tax, not on the sales, but on the local business activities of the seller, and that, therefore, the tax is not an "impost" or "duty" on exports. Although the formal subject of the tax is the "privilege of selling" (Cal. Rev. & Tax. Code, § 6051;

see *Western L. Co.* v. *State Bd. of Equalization,* 11 Cal.2d 156, 164 [78 P.2d 731, 117 A.L.R. 838]), it is clear that the actual taxable event is the sale, or transfer of title or possession, and, in any event, the amount of the tax is expressly measured by gross receipts from sales. (Rev. & Tax. Code, §§ 6006, 6007, 6051.) The United States Supreme Court has stated that in constitutional law cases the formal subject of a tax as declared by a state statute may be disregarded if the tax is in reality on something else, and it has held that taxes purporting to be on local business activities may be unconstitutional if they are in substance on interstate or foreign transactions. (See, for example, *Gwin, White & Prince, Inc.* v. *Henneford,* 305 U.S. 434, 439 [59 S.Ct. 325, 83 L.Ed. 272]; *Crew-Levick Co.* v. *Pennsylvania,* 245 U.S. 292, 294 [38 S.Ct. 126, 62 L.Ed. 295].) In the Crew-Levick case the court said (p. 294) that "we . . . are in duty bound to determine the questions raised under the Federal Constitution upon our own judgment of the actual operation and effect of the tax, irrespective of the form it bears or how it is characterized by the state courts." The court held that a Pennsylvania license tax of $3, together with "one-half mill additional on each dollar . . . of business transacted annually," which in effect covered both local and foreign business, was unconstitutional because it "operates to lay a direct burden upon every transaction in commerce by withholding, for the use of the State, a part of every dollar received in such transactions [exporting merchandise]." (245 U.S. at p. 297.) In like manner, the California sales tax, measured by gross receipts from sales, cannot be applied to export sales since it would withhold "a part of every dollar received in such transactions."

In the early case of *Brown* v. *Maryland,* 12 Wheat. (U.S.) 419 [6 L.Ed. 678], where the state argued that a license tax on importers did not contravene article I, section 10, clause 2, since it was a tax on the person rather than the article, the Supreme Court said (at p. 444): "It is impossible to conceal from ourselves, that this is varying the form, without varying the substance. It is treating a prohibition, which is general, as if it were confined to a particular mode of doing the forbidden thing. All must perceive that a tax on the sale of an article . . . is a tax on the article itself. . . . So, a tax on the occupation of an importer is . . . a tax on importation. It must add to the price of the article, and be paid by

the consumer, or by the importer himself, in like manner as a direct duty on the article itself would be made." By way of dictum the court announced that a license tax on exporters would likewise contravene the prohibitions of the Constitution. And, in the more recent case of *Crew-Levick Co.* v. *Pennsylvania*, 245 U.S. 292 [38 S.Ct. 126, 62 L.Ed. 295], it was expressly held that a state license tax on wholesale vendors of merchandise, measured by gross receipts, is in effect an impost on exports when applied to merchandise sold and shipped to customers in foreign countries. (*Cf. United States* v. *Hvoslef*, 237 U.S. 1 [35 S.Ct. 459, 59 L.Ed. 813] ; *Fairbank* v. *United States*, 181 U.S. 283 [21 S.Ct. 648, 45 L.Ed. 862].) Thus, to the extent that the so-called privilege tax is measured by gross receipts from exports, under the existing decisions of the United States Supreme Court it amounts to a tax on exports and is improper.

It is apparent, however, that a new approach has been taken with respect to the problem of state taxation in the field of interstate commerce, and that there are various local activities by a taxpayer within a state sufficient to support a non-discriminatory tax although the tax may have some incidental effect on interstate commerce. Thus if the present case involved the commerce clause rather than the import-export clause of the federal Constitution, it may be that the tax could properly be imposed, since it falls equally, without discrimination, upon all sales in the state, whether the goods are destined for local use or for export. In *Department of Treasury* v. *Wood Preserving Corp.*, 313 U.S. 62 [61 S.Ct. 885, 85 L.Ed. 1188], for example, an Indiana gross receipts tax was upheld although the goods were sold to an out-of-state buyer and, similar to the situation in the Spalding case, were delivered to a *common carrier* in the taxing state for transportation out of the state. It is somewhat difficult to reconcile these cases upon any other basis than that one concerned foreign commerce and the other interstate commerce.

It does not follow, however, that the views expressed in the Spalding and Crew-Levick cases with respect to imports and exports have been superseded by the interstate commerce decisions. The cases relate to different clauses of the Constitution and involve both different language and different purposes and policies. While a few cases have suggested that the prohibitions of the commerce and import-export clauses of the Constitution are substantially identical insofar as taxation is concerned (*Crew-Levick Co.* v. *Pennsylvania*, 245

U.S. 292, 295 [38 S.Ct. 126, 62 L.Ed. 295]; *Brown* v. *Maryland,* 12 Wheat. (U.S.) 419 [6 L.Ed. 678]), other cases have rejected even an analogy between the two. (*Sonneborn Bros.* v. *Cureton,* 262 U.S. 506 [43 S.Ct. 643, 67 L.Ed. 1095] [refusing to apply original package doctrine to sales of articles transported in interstate commerce]; *Woodruff* v. *Parham,* 8 Wall. (75 U.S.) 123 [19 L.Ed. 382]; *cf. Fairbank* v. *United States,* 181 U.S. 283, 306 [21 S.Ct. 648, 45 L.Ed. 862].)

The latest decision of the United States Supreme Court involving state taxation of articles in foreign commerce expressly rejects the analogy of the interstate commerce cases. (*Hooven & Allison Co.* v. *Evatt,* 324 U.S. 652 [65 S.Ct. 870, 877, 89 L.Ed. 1252].) The state tax there held improper was a general, nondiscriminatory property tax. Although the United States Supreme Court thus had the opportunity to apply the reasoning of the interstate commerce cases, it did not do so, and, further, not even the dissenting opinion discussed the possibility of revising the older cases but, instead, relied upon a factual distinction. (See note (1945) 58 Harv.L.Rev. 858-876.) Until such time as that court determines to permit nondiscriminatory state taxation of sales made in foreign commerce, it would seem improper for a state court to give its approval to such a tax.

The judgment, therefore, should be affirmed.

Edmonds, J., concurred.

Respondent's petition for a rehearing was denied November 29, 1945. Gibson, C. J., and Edmonds, J., voted for a rehearing. Traynor, J., did not participate therein.